# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

────────

No. 14-51079

────────

United States Court of Appeals
Fif h Circuit

**FILED**

December 21, 2016

Lyle W. Cayce
Clerk

In the Matter of:  DELTA PRODUCE, L.P.; STACI PROPERTIES, LIMITED,

Debtors

-----------------------------

KINGDOM FRESH PRODUCE, INCORPORATED; I. KUNIK COMPANY, INCORPORATED; FIVE BROTHERS JALISCO PRODUCE COMPANY, INCORPORATED, doing business as Bonanza 2001; RIO BRAVO PRODUCE, LIMITED COMPANY, L.L.C.; G.R. PRODUCE, INCORPORATED,

Appellees Cross-Appellants

v.

STOKES LAW OFFICE, L.L.P.,

Appellant Cross-Appellee

--------------------------------------------------------
Consolidated with
14-51080
--------------------------------------------------------

In the Matter of:  DELTA PRODUCE, L.P.; SUPERIOR TOMATO-AVOCADO, LIMITED; ATLED, LIMITED; STACI PROPERTIES, LIMITED,

Debtors

-----------------------------

KINGDOM FRESH PRODUCE, INCORPORATED; I. KUNIK COMPANY, INCORPORATED; FIVE BROTHERS JALISCO PRODUCE COMPANY, INCORPORATED, doing business as 300Bonanza 2001; RIO BRAVO

No. 14-51079

PRODUCE, LIMITED COMPANY, L.L.C.; G.R. PRODUCE,
INCORPORATED,

      Appellees

v.

STOKES LAW OFFICE, L.L.P.,

      Appellant

————————————

Appeals from the United States District Court
for the Western District of Texas

————————————

Before REAVLEY, PRADO, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

The prior opinion is withdrawn and the following is substituted to clarify in response to the final argument made in Appellees Cross-Appellants' petition for panel rehearing. The motion is denied otherwise.

This attorney's fee dispute has its roots in the Perishable Agricultural Commodities Act (PACA), a Depression-era statute designed to protect sellers of perishable produce from delinquent purchasers. Two such purchasers filed for bankruptcy and the bankruptcy court appointed special counsel to collect and disburse funds to PACA-protected sellers that had claims against the purchasers-turned-debtors. When special counsel sought approval of his fees and expenses, which would be paid out of the PACA fund, some sellers objected and appealed the bankruptcy court's fee award to the district court, which vacated it. Now that this same chain of events—fee awards, objections, appeals, and vacaturs—has occurred twice more, this case is ripe for decision.

2

No. 14-51079

The question is: can special counsel's fees and expenses be disbursed from the PACA fund?

## I

## A

We begin with some background on PACA.

The short lifespan of produce makes it a risky business. It has been described as an industry "engaged almost exclusively in interstate commerce, which is highly competitive, and in which the opportunities for sharp practices, irresponsible business conduct, and unfair methods are numerous." *See* H.R. Rep. No. 84-1196 (1956), *reprinted in* 1956 U.S.C.C.A.N. 3699, 3701. Sellers "must entrust their products to a buyer who may be thousands of miles away, and depend for their payment upon his business acumen and fair dealing." *Golman-Hayden Co. v. Fresh Source Prod. Inc.*, 217 F.3d 348, 351 (5th Cir. 2000); *see also Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir. 1995) ("[D]ue to the need to sell perishable commodities quickly, sellers of perishable commodities are often placed in the position of being unsecured creditors of companies whose creditworthiness the seller is unable to verify."). Congress thus enacted PACA in 1930 to regulate and "promote fair dealing in the sale of fruits and vegetables," *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 413 (5th Cir. 2003) (internal citation and quotation marks omitted), in part by making it a violation of federal law for buyers of perishable commodities to "fail . . . [to] make full payment promptly" to sellers. 7 U.S.C. § 499b(4).

In 1984, Congress strengthened the protections of the Act by requiring buyers—often brokers that purchase the produce from farmers and then sell it to grocery stores or restaurants—to hold either the produce or all proceeds or accounts receivable from a subsequent sale of the produce in trust for the

benefit of unpaid suppliers until "full payment of the sums owing in connection with such transactions has been received by" the supplier. *See id.* § 499e(c)(2). These amendments were modeled after the statutory trust provisions that Congress added to the Packers and Stockyards Act in 1976, 7 U.S.C. §§ 196–197, so courts have often looked to those "parallel" provisions when interpreting PACA's trust provisions. *See In re Monterey House, Inc.*, 71 B.R. 244, 246 (Bankr. S.D. Tex. 1986); *In re Fresh Approach, Inc.*, 51 B.R. 412, 419–20 (Bankr. N.D. Tex. 1985); *see also Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1382 n.5 (3rd Cir. 1994).

As intended by Congress, which was concerned that suppliers of produce were typically unsecured creditors who lost out when purchasers gave banks a security interest in their accounts receivable,[1] the PACA trust has had a significant effect in bankruptcy. *See In re Lombardo Fruit & Produce Co.*, 12 F.3d 806, 808–09 (8th Cir. 1993). Although buyers hold legal title to the assets in this "nonsegregated 'floating' trust in favor of unpaid sellers," *Bocchi Americas Assocs. Inc. v. Commerce Fresh Mktg. Inc.*, 515 F.3d 383, 388 (5th Cir. 2008), "the seller retains an equitable interest in the trust assets pending full payment." *C.H. Robinson Co. v. Alanco Corp.*, 239 F.3d 483, 487 (2d Cir. 2001). The trust assets are thus insulated from the buyer's bankruptcy estate.

---

[1] Congress made the following findings:

It is hereby found that a burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest. This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

7 U.S.C. § 499e(c)(1).

No. 14-51079

*See* 11 U.S.C. § 541(d) ("Property in which the debtor holds, as of the commencement of the case, *only legal title and not an equitable interest*, . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." (emphasis added)).  Sellers therefore have a "'superpriority' right that trumps the rights of the buyer's other secured and unsecured creditors."  *Bocchi*, 515 F.3d at 388; *see also Golman-Hayden*, 217 F.3d at 351 ("We have recognized that PACA is a 'tough law.' . . . An investor in a perishable commodities corporation 'should know at the beginning of his association with such a corporation that he is "buying into" a corporation which is strictly regulated by the federal government through PACA.'" (internal citations omitted)).   To the extent PACA funds are insufficient to pay each seller in full, the assets are shared pro rata.  *See Golman-Hayden*, 217 F.3d at 349.

> The Ninth Circuit has provided a useful illustration of how this works:

> Farmer sells oranges on credit to Broker.  Broker turns around and sells the oranges on credit to Supermarket, generating an account receivable from Supermarket.  Broker then obtains a loan from Bank and grants Bank a security interest in the account receivable to secure the loan.  Broker goes bankrupt.  Under PACA, Broker is required to hold the receivable in trust for Farmer until Farmer was paid in full; use of the receivable as collateral was a breach of the trust.   Therefore, Farmer's rights in the Supermarket receivable are superior to Bank's. In fact, as a trust asset, the Supermarket receivable is not even part of the bankruptcy estate.

*Boulder Fruit Express & Heger Organic Farm Sales v. Transportation Factoring, Inc.*, 251 F.3d 1268, 1271 (9th Cir. 2001).

## B

It is within this statutory framework that this litigation arose in late 2011 when various unpaid sellers of perishable produce sued Delta Produce, L.P. and Superior Tomato-Avocado—San Antonio-area "repackers"

5

that purchased produce from farmers that they then sold to grocers—and Delta's individual owner in district court for claims arising under PACA. On January 3, 2012, Delta and Superior filed a voluntary petition for chapter 11 bankruptcy. The two cases were consolidated, with the PACA case being referred to bankruptcy court. The PACA creditors that had filed suit in district court explicitly consented to the reference. The remaining PACA claimants filed their claims directly in the bankruptcy court.

Soon thereafter, the debtors, Craig Stokes—an attorney who had previously represented the debtors—and various PACA claimants moved to appoint Stokes as "Special PACA Counsel." A week before filing the motion, one of the PACA claimants emailed a draft of the motion to the other claimants, seeking any comments because "there would probably be a shortened amount of notice to respond" once the motion was filed. The email explained that Stokes "has the working relationship with the Debtor, and it is in the Debtors' and its principal's interest to maximize collections for the trust, so there is no conflict of interest." Although the record reflects that Kingdom Fresh's attorney responded with some "major concerns," none specifically dealt with the issue it raises now about the propriety of paying Stokes with trust funds. The motion was filed on January 19, a hearing was held five days later, and the order—which established a deadline to file claims, laid out the procedure for administering those claims, and appointed Stokes as "Special PACA Counsel"—issued the following day.

As Special PACA Counsel, Stokes was deputized to "take those steps reasonably necessary to preserve and collect the PACA trust assets . . . and to facilitate the distribution of the collected PACA trust assets." The order also provided for Special PACA Counsel's "fees and costs" at a rate of $350 an hour. Those fees and costs would be paid from the PACA trust funds.

6

No. 14-51079

In addition to being appointed as Special PACA Counsel, the debtors also moved to appoint Stokes as debtors' "PACA litigation counsel" pursuant to 11 U.S.C. § 327(e).[2] In an affidavit attached to the section 327(e) motion, Stokes attested that he held a $33,000 retainer from debtors as of the commencement of the case, and agreed to be paid $350 an hour for his section 327(e) services, except that any payment from chapter 11 or PACA trust assets "would require Court approval under the Bankruptcy Code." No one objected, and the court granted the motion requesting this alternative basis for Stokes's role.

As Special PACA Counsel, Stokes collected and liquidated the debtors' assets that were properly part of the PACA trust; reviewed and evaluated the PACA creditors' claims; filed objections to claims and resolved disputes among claimants; collected accounts receivable; and disbursed PACA funds to claimants. During the more than two years that Stokes acted as Special PACA Counsel, he collected over $4 million in PACA assets.

We have now arrived at the rulings that are the subject of this appeal. During the pendency of the PACA litigation, Stokes filed three fee applications: two interim applications for $95,978 plus $2,492.97 in expenses, and $62,807, respectively, and a third and final fee application for $206,371 plus $15,911.02 in expenses, which included $74,526 for a successful mediation. Kingdom Fresh and four other claimants[3] (hereafter "Kingdom Fresh") objected to all three applications, arguing that the bankruptcy court lacked jurisdiction to

---

[2] Section 327(e) of the Bankruptcy Code allows the bankruptcy trustee—not to be confused with the PACA trustee—to employ, with the court's approval, "for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." 11 U.S.C. § 327(e).

[3] The other claimants that objected and appeal are I. Kunik Company, Inc.; Five Brothers Jalisco Produce Company; Rio Bravo Produce, Limited Company, L.L.C.; and G.R. Produce, Inc.

No. 14-51079

disburse PACA trust assets that are not part of the bankruptcy estate and that Stokes could not be paid out of the PACA trust but was instead limited to recovering from the debtor's estate.

At the hearing on the first application, the bankruptcy court concluded that it had proper jurisdiction over the PACA claims. The bankruptcy court, relying on the order appointing Stokes, awarded Stokes fees. Kingdom Fresh appealed to the district court.

With that first appeal pending, Stokes filed his second interim fee application. Kingdom Fresh again objected, reiterating its concerns. When the bankruptcy court again approved Stokes's fees, Kingdom Fresh again appealed. Both appeals were consolidated.

In reviewing both interim applications, the district court agreed that the bankruptcy court had proper jurisdiction over the PACA trust but vacated the fee awards. *Kingdom Fresh Produce v. Bexar Cty. (In re Delta Produce, LP)*, 498 B.R. 731 (W.D. Tex. 2013). With respect to the fees, the district court relied on the language of the statute and *C.H. Robinson Co. v. Alanco Group*, 239 F.3d 483 (2d Cir. 2001), to hold that because Stokes "[e]ssentially . . . acted as a trustee for the PACA trust," he was not entitled to attorney's fees paid out of the trust unless and until the trust beneficiaries were paid in full. *Id.* at 745. In its view, the award of any fees "before PACA trust beneficiaries receive full payment would directly violate the language of PACA and its regulations." *Id.* at 746.

While that first appeal to the district court was still pending, Stokes filed his third and final fee application. Kingdom Fresh objected for the same reasons but also argued that Stokes labored under a conflict of interest. Before the bankruptcy court held a hearing on the third application, the district court issued its ruling vacating the first and second fee applications. The bankruptcy court nevertheless again found in Stokes's favor and approved his final

request.  It found that a number of PACA claimants—not including Kingdom Fresh—waived their objections to Stokes's fee applications by signing a consent form and thus Kingdom Fresh could not object to the portion of Stokes's fee associated with those consenting PACA claimants.  That portion of the fee was thus disbursed to Stokes, but the bankruptcy court stayed the portion of the fee allocable to Kingdom Fresh—$14,518.20 in fees and $1,135.24 in expenses—pending appeal.

Again Kingdom Fresh appealed  and again the district court vacated the bankruptcy court's opinion, reiterating the reasoning from its earlier orders that PACA beneficiaries are entitled to "full payment" before any others—including Special PACA Counsel—can be paid from the PACA trust assets.  *See Kingdom Fresh Produce v. Bexar Cty. (In re Delta Produce, LP)*, 521 B.R. 576, 583 (W.D. Tex. 2014).  The district court also clarified that Stokes had other avenues for compensation: "(1) he can seek payment from the buyer/debtor, or (2) he can seek payment from the PACA trust but *only after all PACA beneficiaries have received full payment*."  *Id.* at 593 (emphasis in original). Given its fee finding, the district court declined to decide whether Stokes labored under a conflict of interest.  *Id.* at 599.  Stokes appeals both of the district court's orders, which have been consolidated, and Kingdom Fresh cross appeals on the conflict of interest issue.

## II

Before turning to the merits of this fee dispute, we address two jurisdictional questions: (1) whether in light of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the bankruptcy court had jurisdiction over the PACA case that was transferred from the district court, and (2) if so, whether the district court had appellate jurisdiction over the two interim fee applications.

No. 14-51079

## A

Although the bankruptcy court raised the issue of its authority to resolve PACA claims, neither party raises it here.  We nonetheless have an obligation to address a jurisdictional question like this one.  In *Stern*, the Supreme Court held that although the bankruptcy court had statutory authority to enter final judgment on a state law counterclaim, it lacked constitutional authority to do so.  131 S. Ct. at 2620.  It explained that "Congress may not withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or in admiralty." *Id.* at 2609 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856)).  To determine whether a bankruptcy court has the constitutional authority to decide a claim, the question is not whether "a proceeding may have *some* bearing on a bankruptcy case," but rather "whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Id.* at 2618 (emphasis in original).

*Stern*'s impact on what has been a common practice—litigating PACA claims in bankruptcy court—presents a difficult question.  To be sure, PACA's trust provisions have a direct and significant effect on bankruptcy by creating "superpriority" status for sellers of produce.  Yet the effect of these provisions is that trust assets are "not even part of the bankruptcy estate." *Boulder Fruit Express & Heger Organic Farm Sales*, 251 F.3d at 1271.  PACA claims can be and are litigated outside of bankruptcy. *See, e.g.*, *Bocchi Americas*, 515 F.3d at 383 (case involving PACA trust claims litigated in district court).  Although the source of a PACA claim is federal statutory law rather than state common law, what was true of the counterclaim in *Stern* is also true of PACA claims— they "exist[] without regard to any bankruptcy proceeding." *Stern*, 131 S. Ct. at 2618.

But we need not resolve doubts about the bankruptcy court's constitutional authority to adjudicate PACA claims because there was consent for it to act.  The Supreme Court recently held that "allowing bankruptcy litigants to waive the right to Article III adjudication of *Stern* claims does not usurp the constitutional prerogatives of Article III courts."  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1944–46 (2015).  Such consent may be implied, so long as "'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non-Article III adjudicator."  *Id.* at 1948 (quoting *Roell v. Withrow*, 538 U.S. 580, 590 (2003)).

The original PACA claimants that filed in federal district court consented to adjudication of their claims, which necessarily implicated the entire PACA trust, in bankruptcy court.  Claimants like Kingdom Fresh later filed PACA claims in this proceeding in which the docket sheet put them on notice that the original filers had consented to bankruptcy court adjudication.  They raised no constitutional objection when joining the case.  This consent—express from some parties and implied from others—thus vested the bankruptcy court with jurisdiction to preside over the PACA claims even if doing so posed a *Stern* problem.  *See Wellness Int'l Network, Ltd. v. Sharif*, 617 Fed. App'x. 589 (7th Cir. 2015) (holding on remand from the Supreme Court that appellant had forfeited a *Stern* claim when he did not raise it until his reply brief in the district court appeal of the bankruptcy order he was challenging).

**B**

The scope of the bankruptcy court's constitutional authority to adjudicate the PACA claims is not the only jurisdictional issue in this case.  Stokes asserts that the district court lacked appellate jurisdiction to review the

bankruptcy court's two interim fee awards because they were not final orders. We agree.

"Virtually all decisions agree that the concept of finality applied to appeals in bankruptcy is broader and more flexible than the concept applied in ordinary civil litigation."  16 Charles Alan Wright & Arthur R. Miller, FED. PRAC. & PROC. § 3926.2 (3d ed.).  This circuit has expressly rejected a "rigid rule of finality" in bankruptcy appeals and instead views finality "in a practical, less technical light."  *ASARCO, Inc. v. Elliott Management (In re ASARCO, L.L.C.)*, 650 F.3d 593, 600 (5th Cir. 2011) (citation omitted).  A "case need not be appealed as a 'single judicial unit' at the end of the entire bankruptcy proceeding, but the order must constitute a 'final determination of the rights of the parties to secure the relief they seek in this suit,' or the order must dispose of a discrete dispute within the larger bankruptcy case for the order to be considered final."  *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1155 (5th Cir. 1988) (internal citations omitted).

Yet even under this "flexible" approach, *In re ASARCO, L.L.C.*, 650 F.3d at 600, we have held that interim fee awards are interlocutory orders—the very term interim denotes that such an award is not the end of the fee dispute—and thus not subject to automatic review.  *See Cluck v. Osherow (In re Cluck)*, 101 F.3d 1081, 1082 (5th Cir. 1996) ("Every circuit which has addressed this issue has concluded that an interim award of compensation granted by a bankruptcy court in an ongoing bankruptcy proceeding generally is an interlocutory order which is not subject to review."); *see also* 1 COLLIER ON BANKRUPTCY ¶ 5.08[5] (16th ed.) (providing that "order[s] fixing interim compensation for professionals" have been held to be interlocutory); 16 Wright & Miller, § 3926.2 (same).

12

These interlocutory orders were nonetheless still subject to review if the district court granted Kingdom Fresh leave to appeal under 28 U.S.C. § 158(a)(3). Although Kingdom Fresh did not seek such leave, it invokes the bankruptcy rule providing that "[i]f an appellant timely files a notice of appeal . . . but does not include a motion for leave, the district court . . . may order the appellant to file a motion for leave, or treat the notice of appeal as a motion for leave and either grant or deny it." FED. R. BANKR. P. 8004(d). Kingdom Fresh contends that by issuing a lengthy order on the merits, the district court impliedly granted leave to appeal. But this court recently rejected that reasoning in an unpublished decision. *Stansbury v. Holloway (In re Holloway)*, 370 F. App'x 490, 493 (5th Cir. 2010) (citing *Clark v. First State Bank (In re White Beauty View, Inc.)*, 841 F.2d 524, 527 (3d Cir. 1988), for the proposition that "a district court cannot impliedly grant leave to appeal by merely ruling on an appeal before it from the bankruptcy court"). We adhere to that view. In allowing a district court to treat a notice of appeal as a request for leave to appeal, Rule 8004(d) still contemplates some exercise of discretion by the district court—it must "either grant or deny" leave to appeal. FED. R. BANKR. P. 8004(d). This makes sense given that interlocutory appeals are still disfavored, despite the more lenient view of finality in the bankruptcy context. *See In re White Beauty View*, 841 F.3d at 526. The multiple appeals in this case demonstrate the burden of hearing interlocutory appeals. The district court issued more than a hundred pages in three almost identical orders: the first order vacating the bankruptcy court's first and second fee awards, a denial of a motion to reconsider that first order, and the last order vacating the bankruptcy court's final fee order.

Nowhere in the orders on the interim appeals is there an indication that the district court realized these were interlocutory orders and believed there was a benefit to hearing them in this piecemeal manner. That absence means

the district court did not have appellate jurisdiction over the first two interim fee orders.  And Kingdom Fresh did not seek to appeal all three fee orders in its final, timely appeal to the district court.  We therefore vacate for lack of jurisdiction the district court's order vacating the first and second fee awards, *see In re Delta Produce, LP*, 498 B.R. 731, and remand with instructions to dismiss the appeal, *see Smith v. Gartley (In re Berman-Smith)*, 737 F.3d 997, 1003 (5th Cir. 2013) (finding that the "proper remedy" when the district court is left without jurisdiction to hear an appeal "is to vacate the decision of the district court and remand with instructions to dismiss the appeal" (citing *Hollingsworth v. Perry*, --- U.S. ----, 133 S. Ct. 2652, 2668 (2013))).

## III

With these jurisdictional issues peeled away, we are down to only an appeal of the order granting Stokes's final fee application in the amount of $206,371.  But before getting to the core of the dispute, a bit more paring is warranted.  Kingdom Fresh is the only claimant objecting to Stokes's fees; the other PACA claimants consented to paying his fee from the trust assets.  Stokes therefore argues that Kingdom Fresh has no standing to challenge the entire fee award of more than $200,000, but rather is limited to the 6.68% of the Superior PACA trust assets and 7.81% of the Delta trust assets that Kingdom Fresh holds.  We agree.

In bankruptcy cases, courts follow a "person aggrieved" test, which is "more exacting . . . than traditional constitutional standing." *Gibbs & Bruns LLP v. Coho Energy, Inc. (In re Coho Energy Inc.)*, 395 F.3d 198, 203 (5th Cir. 2004).  "Because bankruptcy cases typically affect numerous parties," which is also true of this PACA litigation that ended up being litigated in bankruptcy court, "the 'person aggrieved' test demands a higher causal nexus between act and injury; appellant must show that he was 'directly and adversely affected

pecuniarily by the order of the bankruptcy court' in order to have standing to appeal." *Id.* (citation omitted).

Kingdom Fresh cannot claim to be affected financially by the other PACA claimants' consent to pay Stokes. Although PACA claimants share PACA funds pro rata when there is an insufficient "pot" of money to pay each claimant in full, *see Golman-Hayden*, 217 F.3d at 349, the disbursements were already distributed on that pro rata basis and the fees were charged in the same manner. Allowing Stokes to be paid the fees and expenses allocable to these other PACA claimants does not affect Kingdom Fresh's share of the PACA trust, which has already been set aside at the direction of the bankruptcy court. Put another way, we see no reason why Kingdom Fresh has any say in how the other claimants chose to spend their PACA funds. Assuming the district court is correct that the trust funds cannot be used to pay Stokes until all claimants have been paid (we are almost to the point of deciding that question), the PACA claimants can do what they wish with funds to which they are legally entitled. They can use the PACA funds to pay business expenses, expand their produce-growing operations, or (subject to any fiduciary duties owed to investors) try their luck in Vegas. Likewise, they can chose to use the funds to pay a lawyer like Stokes. We thus find that Kingdom Fresh has no standing to dispute the percentage of Stokes's fee allocable to the nonobjecting parties. Only the small percentage of Stokes's fee apportionable to Kingdom Fresh is at issue in this appeal; Stokes is free to keep the remainder.

## IV

Although a smaller pot of money is now at stake (only the $15,653.44 that was Kingdom Fresh's share of the final fee award), the question remains: can Stokes's fees be deducted from the PACA trust assets before all claimants are made whole?

PACA's trust provision evinces no exceptions. It states that buyers of perishable agricultural commodities must hold receivables or proceeds from the sale of those commodities in trust for the benefit of all unpaid sellers "until full payment of the sums owing in connection with such transactions has been received" by the sellers. 7 U.S.C. § 499e(c)(2). This strict directive was not accidental. Congress's 1984 amendments aimed at remedying the "burden on commerce in perishable agricultural commodities and to protect the public interest" by doing away with financing arrangements in which buyers would give lenders a security interest in the produce, thus subordinating the often unsecured sellers. *See id.* § 499e(c)(1); *see also Endico Potatoes*, 67 F.3d at 1067 ("Due to a large number of defaults by the purchasers, and the sellers' status as unsecured creditors, the sellers recover, if at all, only after banks and other lenders who have obtained security interests in the defaulting purchaser's inventories, proceeds, and receivables."). The "full payment" requirement is thus paramount in protecting sellers of perishable produce.

This court has never interpreted the breadth of this PACA provision but case law from other circuits provides guidance. The district court relied primarily on *C.H. Robinson Co. v. Alanco*, in which an attorney who represented a produce purchaser in a PACA lawsuit—litigated outside the bankruptcy context—sought to collect unpaid attorney's fees by withholding a portion of the PACA settlement proceeds being disbursed to a seller.[4] 239 F.3d at 485. The attorney argued that "his services were in fulfillment of [the purchaser's] duty to the PACA trust beneficiaries and solely for their benefit, and, therefore, he [was] entitled to be paid out of the trust res under general principles of trust law." *Id.* at 486. The Second Circuit disagreed. It pointed

---

[4] The attorney in question in *C.H. Robinson* was none other than Mark Mandell, the attorney representing Stokes in this litigation.

out that "[u]nlike most common law trusts, a PACA trust entitles the trust beneficiary to a sum certain," which means that the sellers, as trust beneficiaries, "are entitled to full payment before trustees may lawfully use trust funds to pay other creditors." *Id.* at 487–88. It thus held that "a PACA trustee may not use PACA funds to pay attorney's fees incurred in collecting accounts receivable held in trust for a seller of perishable agricultural commodities." *Id.*

There is some authority that points in the other direction. In *Bank of Los Angeles v. Official PACA Creditors' Committee (In re Southland + Keystone)*, 132 B.R. 632 (B.A.P. 9th Cir. 1991), for example, a bank liquidated collateral of a defaulting creditor but it was later determined that PACA creditors had priority over the bank to those funds. The bank argued that it should be compensated for its collection costs given that it had done all the legwork required to collect the PACA trust assets. *Id.* at 642. The court agreed:

> When a bankruptcy trustee collects receivables and those moneys are subsequently turned over to PACA claimants, it should be allowed to offset its collection costs. The Bank here collected the receivables before they became stale. This undoubtedly resulted in a higher recovery than if the receivables had not been promptly collected. To deny the Bank any recovery would be unfair to the Bank and provide a windfall to the PACA claimants.

*Id.* at 643. That analysis relied on *In re United Fruit and Produce Co., Inc.*, 119 B.R. 10 (Bankr. D. Conn. 1990), for the proposition that because a "bankruptcy trustee of the debtor's estate [had] rendered substantial services in collecting the PACA receivable for the benefit of the PACA beneficiaries . . . [t]he non-PACA creditors of this estate should not pay for these services and the trustee should not be forced to donate them." *Id.* at 13.

17

No. 14-51079

Our best reading of the cases is that they draw a distinction, admittedly a somewhat blurred one, between individuals who are PACA trustees or their functional equivalents—who owe fiduciary duties to the PACA claimants and are thus aware of the trust provision—and those whose primary role is outside the PACA trustee framework and do not owe duties to the claimants. *See C.H. Robinson*, 239 F.3d at 488 ("Even if we were to adopt the rule announced in *In re Southland + Keystone* for non-PACA trustees, we would not extend it to the case at bar because Alanco is a PACA trustee. . . . [A] PACA trustee has a fiduciary obligation under PACA to repay the full amount of the debt owed to the PACA beneficiary. Bankruptcy trustees and other collecting agents may not owe the same fiduciary duties to PACA beneficiaries, and therefore the law governing them is inapplicable."); *see also Six L's Packing Co. v. Post & Taback, Inc.*, 132 F. Supp. 2d 306, 309 (S.D.N.Y. 2001)[5] (ordering that fees incurred by PACA trustee in fulfilling its obligations "shall *not* be paid, directly or indirectly, from PACA trust funds," but appointing special master pursuant to Rule 53 to "assist the Court in evaluating the claims," and ordering payment to be drawn from PACA trust account). We thus examine Stokes's duties as Special PACA Counsel.

We recognize that Stokes's role was somewhat different than Mandell's in *C.H. Robinson*, likely not unintentionally—the court appointed Stokes to be Special PACA Counsel whereas Mandell directly represented the buyer-turned-PACA trustee. Those involved in this litigation were also careful not to pin him as a "trustee," instead opting for the "Special PACA Counsel" title. Additionally, Stokes did not simply withhold his fees from the PACA claimants' disbursements, but rather followed the procedure for fee motions set out in the

---

[5] Mandell also represented the purchasers in *Six L's Packing Co.*, 132 F. Supp. 2d at 307. The "broccoli bar" appears to be an exclusive one. See *infra*, 19 at n.5.

order appointing him, which including a clause stating that he was "entitled" to fees and costs from the PACA trust fund.

But as hard as Stokes endeavored to avoid the application of *C.H. Robinson*—which he was no doubt familiar with given the doubtless small "broccoli bar"[6] and the fact that his attorney Mandell played an active role in that case—he was the functional equivalent of a PACA trustee. The Order appointing Stokes as Special PACA Counsel authorized him to "take those steps reasonably necessary to preserve and collect that PACA trust assets as defined at 7 U.S.C. § 499e(c) [the PACA trust provision]." Stokes was authorized to accomplish this goal by:

> (a) attempting to determine the extent to which assets are PACA trust assets, including filing or defending adversary proceedings including declaratory judgment actions, (b) examining PACA trust claims filed by alleged PACA trust beneficiaries, and objecting to those claims where appropriate, (c) collecting the Debtors' accounts receivables, including filing adversary actions, and (d) liquidating PACA trust assets other than the accounts receivables into cash.

These are the fundamental duties of a PACA trustee. *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701, 705 (2d Cir. 2007) ("As a PACA trustee, a produce buyer is charged with a duty 'to insure that it has sufficient assets to assure prompt payment for produce and that any beneficiary under the trust will receive full payment.'" (citation omitted)); *Boulder Fruit Express*, 251 F.3d at 1271 ("[A] commercially reasonable sale of accounts for fair value is entirely consistent with the trustee's primary duty under PACA . . . to maintain trust assets."). Most critically, as Stokes concedes, his "sole purpose was to benefit the PACA trust." Appellant Brief at 19; *see also id.* ("Appellant

---

[6] In their motion to appoint Stokes as § 327(e) counsel, debtors pointed out that Stokes is a "leading member of the 'broccoli bar,'" which apparently refers to attorneys specializing in PACA.

was envisioned by the Judge, the Debtors, the Principal, the U.S. Trustee and the PACA claimants . . . to work for 'the trust itself.'").   Despite the different form, the substance of Stokes's work therefore is indistinguishable from the work of the *C.H. Robinson* trustee.   *See C.H. Robinson*, 239 F.3d at 488 (distinguishing the trustee in that case from parties in other cases who did not owe duties to the PACA claimants).  And we agree with the Second Circuit that PACA's unequivocal language requires that a PACA trustee—or in this case, its functional equivalent—may not be paid from trust assets "until full payment of the sums owing" is paid to all  claimants. 7 U.S.C. § 499e(c)(2).

We recognize that fidelity to the inviolable nature of the PACA trust Congress created gives rise to a free rider concern.  It will often take the work of an attorney or other professional to maximize a PACA recovery, and it is not desirable for some claimants but not others to bear this burden.   But there are other options for equitable allocation of collection efforts.   The most straightforward method in a bankruptcy case is the alternative procedure the bankruptcy court ordered: appointment under section 327 of the Bankruptcy Code which allows a "professional . . .  (A) reasonable compensation for actual, necessary services rendered."  11 U.S.C. § 330.  Section 327 professionals are not relegated to the end of the bankruptcy line but are instead "afforded second priority in the distribution of an estate."   *See* 3 COLLIER ON BANKRUPTCY ¶ 330.01.  Although this avenue may not lead to full recovery, the prevalence of professionals willing to bear that risk by taking section 327 appointments dispels the amicus's fear that no one will want to assist PACA claimants. *Cf. C.H. Robinson*, 239 F.3d at 488 ("[The trustee's] prediction that a ruling against it will have dire consequences for the produce industry is hyperbole."). Second, had the case remained in district court, the judge would have had the authority to appoint a special master whose expenses could be shared by the parties.  *Compare* FED. R. CIV. P. 53 (procedure for appointing special master

No. 14-51079

in district court), *with* FED. R. BANKR. P. 9031 ("Rule 53 F. R. Civ. P. does not apply in cases under the Code."). Finally, a majority of courts—including the only district court to have considered the issue—allow PACA producers to recover attorneys' fees related to collection efforts from the PACA trust if entitlement to those fees is included in the sales contract. *See* Mark Duedall, *The Interaction Between the Bankruptcy Code and the Perishable Agricultural Commodities Act*, 2006 ANN. SURV. BANKR. LAW 4 ("Most cases hold that PACA Trust beneficiaries are entitled to attorney's fees paid from the PACA Trust if their governing contractual documents or invoices call for such charges." (citing *Country Best v. Christopher Ranch, LLC*, 361 F.3d 329 (11th Cir. 2004))).

These options may seem like they are just elevating form over substance, something we just decried in rejecting the significance of Stokes not receiving the "trustee" title. But there is one difference: unlike Stokes's fee application in this case or the trustee's fee request in *C.H. Robinson*, in neither the section 327 bankruptcy professional or district court special master scenarios are the costs coming directly out of the PACA trust. The superpriority status of PACA claimants is preserved and the attorney claimants bear the greater risk of nonpayment. That difference is the very one Congress sought to achieve with the trust amendments to PACA. *See C.H. Robinson*, 239 F.3d at 488 (observing that "the intent of Congress in enacting PACA's trust provision was to provide unpaid produce sellers with greater protection from the risk of default by buyers").

V

There remains a little bit of juice to squeeze out of this case. Stokes also argues that even if PACA prevents paying him with trust funds until all produce suppliers are compensated, Kingdom Fresh should be estopped from

21

objecting to the fees.[7]   Estoppel is an equitable doctrine and "the decision whether to invoke it [is] within the court's discretion." *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999).  This court thus reviews the district court's rejection of the doctrine for abuse of discretion.  *Id.*

Stokes points out that Kingdom Fresh did not object to his appointment or his duties as Special PACA Counsel until he filed his first fee application, which happened about eight months after he was first appointed.  The district court rejected this as a basis for estoppel.  It pointed out that Kingdom Fresh never joined the proposed PACA claim procedure motion that appointed Stokes and that although it appeared at the hearing on the motion, it "had *two days* to prepare for the expedited hearing." *In re Delta Produce, LP*, 521 B.R. at 597 (emphasis in original).   It also believed that Kingdom Fresh's eventual objection to the first fee request was timely, as it was made "less than eight months after Special Counsel had been appointed." *Id.*   We do not conclude that the district court abused its discretion in rejecting the estoppel argument. *See Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000) ("To constitute an abuse of discretion, the district court's decision must be either premised on an application of the law that is erroneous, or on an assessment of the evidence that is clearly erroneous.").

Lastly, because we rule on other grounds that Stokes's fees could not be paid with trust assets, we need not reach Kingdom Fresh's contention that Stokes was operating under a conflict of interest.

\* \* \*

---

[7] Stokes also invokes waiver, but we find no intentional relinquishment of Kingdom Fresh's right to oppose a fee request. *See Home Ins. Co. v. Matthews*, 998 F.2d 305, 309 (5th Cir. 1993) (explaining that "the elements of waiver and estoppel are different. . . . [W]aiver [is] the intentional relinquishment of a known power or privilege.  Equitable estoppel is founded on detrimental reliance on the representations of the other party." (internal citations and quotation marks omitted)).

No. 14-51079

The district court's order vacating the first two fee awards is itself VACATED for lack of jurisdiction, and we REMAND with instructions to dismiss the appeal of that order.  The district court's order vacating the final fee award is AFFIRMED but only as to the pro rata share of the fees allocated to Kingdom Fresh and the other four claimants that appealed.