PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

―――――――――

No. 17-2449

―――――――――


In re:  TRIBUNE MEDIA COMPANY, et al.,
REORGANIZED DEBTORS, f/k/a
TRIBUNE COMPANY,

KEITH YOUNGE,
                                    Appellant

―――――――――


Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-16-cv-00226)
District Judge: Honorable Gregory M. Sleet

―――――――――


Argued April 25, 2018

Before: AMBRO, SCIRICA, and SILER, Jr.⬧, Circuit Judges

―――――――――

⬧ Honorable Senior Judge Eugene E. Siler, Jr., Circuit Court
Judge for the Sixth Circuit Court of Appeals, sitting by
designation.

(Opinion filed: September 5, 2018 )

Timothy P. Creech, Esquire          (Argued)
1835 Market Street, Suite 2626
Philadelphia, PA   19103

          Counsel for Appellant

Kenneth P. Kansa, Esquire
Robert N. Hochman, Esquire          (Argued)
Sidley Austin
One South Dearborn Street
Chicago, IL  60603

J. Kate Stickles, Esquire
Cole Schotz
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801

          Counsel for Appellee

———————————

## OPINION OF THE COURT

———————————

AMBRO, Circuit Judge

Keith Younge is an African-American man who was fired by WPHL, a Philadelphia television station owned by Tribune Media Company ("Tribune").  He claims the station subjected him to a hostile work environment because it scheduled him to train under a white co-worker who accosted him with racial epithets.  He further contends he was wrongfully terminated because of his race and/or color.

Although Younge filed a complaint with the Pennsylvania Commission on Human Relations, he chose to litigate his claims in Bankruptcy Court after Tribune filed a Chapter 11 bankruptcy petition. When it disallowed his claims, Younge appealed to the District Court. There he challenged for the first time the Bankruptcy Court's jurisdiction to hear his claims. The District Court held he impliedly consented to the Bankruptcy Court's jurisdiction. It also concluded the Bankruptcy Court correctly disallowed his hostile work environment and wrongful termination claims. Because we agree, we affirm.

## I.    Background matters

### A.    Factual background

In April 2008, Younge was hired as a seasonal, part-time technician by WPHL. He was trained by full-time technicians, as he was responsible for covering their vacation schedules between Memorial Day and Labor Day. On May 7, 2008, Younge was scheduled to train with Rick Schultz, an engineering technician. Before Younge's training began, Sandy Kerr, a technician, told him, "If you run into any trouble tonight[,] make sure you tell me tomorrow." *In re Tribune Media Co.*, Case No. 08–13141(KJC), 2016 WL 1122865, at *2 (Bankr. D. Del. Mar. 18, 2016) (internal quotation marks omitted). When he asked Steve Leff, another technician, to explain Kerr's statement, Leff said, "Schultz has a problem." *Id.* When Younge inquired whether Schultz had a problem with him, Leff replied, "No, he just has a problem." *Id.* (internal quotation marks omitted).

During his training with Schultz, Younge walked into the room and placed his briefcase on the table. Schultz immediately responded, "Hey Spike, you want to get this off the table?" App. at 127a (internal quotation marks omitted).

3

Assuming Schultz did not know his name, Younge introduced himself. The former answered, "[A]s far as [I] am concern[ed,] you are Spike Lee." *Id.* (internal quotation marks omitted). Younge walked over to Schultz and retorted, "I told you what my name is," and Schultz countered, "I'll call you anything I want to." *Id.* (internal quotation marks omitted). Younge, in an attempt to diffuse the situation, stated, "[W]hoa, I don't know what's going on here[.] [A]ll you have to do is train me." *Id.* at 157a (internal quotation marks omitted). Schultz replied, "I don't work for you, I don't have to listen to you, I don't have to train you, some intern." *Id.* When Younge told him he was not an intern and had been in the television industry for years, Schultz asked, "Well[,] why don't you know nothing?" *Id.* (internal quotation marks omitted).

Schultz walked into the adjacent room, and Younge followed him. The argument continued, with both parties yelling and using profanity. At one point, Schultz told Younge to "take that shit back to the ghetto[,] hommie." *Id.* at 127a (internal quotation marks omitted). Younge also said, "Hey motherfucker, use my name[;] motherfucker[,] I dare you to hit me." *Id.* at 160a (internal quotation marks omitted). Eventually, the station's security officer entered the room and physically separated both men. Ed Elias, the technician-in-charge, called the station and spoke with Younge. He told him to go home and assured him that the station would investigate the incident in the morning.

The next day, Younge called Elias and Michael Hort, a supervisor. After hearing Younge's account of the altercation, one of them said, "[Y]ou should have never had to deal with that—we have had problems with S[c]hultz before." *Id.* at 74a (internal quotation marks omitted). On May 12, 2008, Shalona Douglas, a human resources coordinator, called Younge to investigate the incident. She asked him whether he cursed at Schultz. Younge responded that he did. Douglas probed

4

further, inquiring whether Younge remembered what he said. He answered, "[N]o, I was angry[.] I don't remember." *Id.* (internal quotation marks omitted). Finally, she asked if Younge had spit on Schultz. He replied, "[A]bsolutely not." *Id.* (internal quotation marks omitted). Douglas also spoke with Schultz and other technicians, including Leff. The latter informed her that Schultz made a number of comments immediately before training Younge. For example, Schultz told other technicians that Younge "look[ed] like Spike Lee," *id.* at 162a (internal quotation marks omitted).

Douglas submitted her findings to Vincent Giannini, WPHL's Vice President and General Manager. After reviewing them, he concluded both Younge and Schultz should be discharged for violating WPHL's Code of Conduct and Anti-Harassment Policy. The station sent termination letters to both men on May 15, 2008.

### B.      Procedural background

Younge filed a complaint with the Pennsylvania Commission on Human Relations in June 2008 alleging he was subjected to a hostile work environment and wrongfully terminated because of his race and/or color. He forwarded a copy of his complaint to the Equal Employment Opportunity Commission, which notified him that it would not act on his complaint until its Pennsylvania counterpart issued final findings and orders. Younge's claims were based on Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq.*; and the Philadelphia Fair Practices Ordinance, Phila., Pa., Code ch. 9-1100 *et seq.*

The Pennsylvania Commission on Human Relations began investigating the complaint during the same month. It started by gathering evidence from WPHL and Schultz. The

5

former responded to the agency's questions and provided company records as requested. Schultz also spoke with the Commission. He said that on, May 6, 2008 (*i.e.*, the day before he trained Younge), he asked Leff, "[W]hy are you training a hoop . . . who doesn't know anything?" App. at 159a (internal quotation marks omitted). He also admitted he gave Younge a nickname—"Spike Lee"—and acknowledged his own nickname was the "Nazi." *Id.* at 163a. Schultz, however, never mentioned whether WPHL's management knew of his nickname before his altercation with Younge.

In December 2008, when the Commission's investigation was still ongoing, Tribune and its affiliates (including WPHL) filed for Chapter 11 bankruptcy (for simplicity, we refer to all debtors as "Tribune"). Younge responded by filing a proof of claim in the Bankruptcy Court.[1] Tribune objected to it. Because Younge was not represented by counsel at the time, he filed a *pro se* response to Tribune's objection. When he obtained counsel, the Bankruptcy Court held a hearing on the claim and allowed Younge's counsel to file a supplemental response that included additional evidence. Tribune, in turn, filed a supplemental reply. After the parties completed briefing, the Court notified them that it was reviewing Tribune's objection, *see id.* at 59a (docket entry stating "Judge Carey is reviewing this case"), and construed it as a motion for summary judgment.

---

[1] Because Younge opted to litigate in Bankruptcy Court, his proceedings before the Pennsylvania Commission on Human Relations were automatically stayed. He did not file a motion for relief from the automatic stay to allow the investigation to continue. *See* 11 U.S.C. § 362(a)(1) (stating administrative actions that predate any proceedings under Title 11 are automatically stayed).

The Court sustained the objection. It held Younge could not establish a hostile work environment claim because he could not prove *respondeat superior* liability (*i.e.*, that WPHL was liable for Schultz's discriminatory behavior because it knew of Schultz's racial animus and failed to take prompt remedial action). In reaching this conclusion, the Court considered Schultz's personnel file and employment history. It noted Schultz had been employed at WPHL since 1972 and had been involved in two other altercations with his co-workers. The first altercation involved accusations of racial bias and occurred in 1993. A security guard was angry that Schultz accidentally tripped a door alarm and accused him of making a racist comment. Schultz, however, denied any type of racial animus, and the letter in his personnel file included his take of the incident. While the second altercation did not contain any allegations of racism, it involved profanity and took place in 2002. In view of this evidence, the Court acknowledged it was "troubl[ed]" by the incident from 1993. *In re Tribune Media Co.*, 2016 WL 1122865, at *6. Nonetheless it concluded that a single altercation from 1993 did not "provide[] the [s]tation with notice or reason to know that Schultz would create a hostile work environment" or "harass Younge with racial slurs in May 2008." *Id.* at *6-7.

Turning to the wrongful termination claim, the Bankruptcy Court applied the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973) (noting that, after a plaintiff-employee proves a *prima facie* case of discrimination, the employer must offer a legitimate, non-discriminatory reason for its action and the plaintiff may rebut this reason by showing that it is pretextual). It observed that WPHL provided a legitimate, non-discriminatory reason for firing Younge because it discharged him for violating the station's Code of Conduct and Anti-Harassment Policy. It concluded Younge failed to show that the station's reasons were pretextual

7

because he admitted he engaged in conduct that was prohibited by WPHL's employment policies. Though Younge pointed to WPHL's favorable treatment of Schultz following his 2002 altercation as evidence of pretext (he only received a written warning), the Bankruptcy Court rejected that argument. It noted Younge provided "no evidence that the [2002 and 2008 incidents] were of comparable seriousness." *In re Tribune Media Co.*, 2016 WL 1122865, at *11. In the Court's view, "the best comparator for Younge's [discharge] [was] the [s]tation's treatment of Schultz, who participated in the same incident[,] was investigated at the same time by the same people . . . [, and] received the same treatment." *Id.* Accordingly, the Court concluded Younge was not wrongfully terminated because of his race and/or color and disallowed his claim in its entirety.

Younge appealed to the District Court. He contested the Bankruptcy Court's jurisdiction for the first time and argued its proceedings violated his due process rights and his Seventh Amendment right to a jury trial. He also challenged the Bankruptcy Court's decision as to his hostile work environment and wrongful termination claims. The District Court observed that Younge never raised the issue of jurisdiction during bankruptcy proceedings. Instead, he litigated his claim to a final judgment, filing two responses to Tribune's claim objection, appearing at a hearing, and acknowledging that the Court would "fully evaluate [his] claim." *In re Tribune Media Co.*, C.A. No. 16-226 (GMS), 2017 WL 2622743, at *5 (D. Del. June 16, 2017) (alteration omitted) (internal quotation marks omitted) (quoting App. at 212a). In light of these actions, the Court held that Younge waived any objection to adjudication in Bankruptcy Court and impliedly consented to its jurisdiction. The District Court also held that the Bankruptcy Court did not violate Younge's due process rights, as it gave him ample opportunities to submit additional evidence, and it did not violate his Seventh

8

Amendment right to a jury trial by disallowing his claim. Finally, the District Court affirmed the rulings on Younge's hostile work environment and wrongful termination claims, providing the same reasons as those in the Bankruptcy Court's opinion. This appeal followed.

## II.    Standard of Review

"Our review of the District Court's order on [the Bankruptcy Court's] jurisdiction is *de novo.*" *In re Resorts Int'l, Inc.*, 372 F.3d 154, 160 (3d Cir. 2004). We also "review *de novo* the bankruptcy court's order granting summary judgment." *In re Segal*, 57 F.3d 342, 345 (3d Cir. 1995). It is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] party will not be able to withstand a motion for summary judgment merely by making allegations." *In re Ikon Office Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002). Instead, the nonmoving party must "designate specific facts" in the record to "show[] that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted).

## III.    Discussion

### A.    The Bankruptcy Court had jurisdiction over Younge's claims.

A bankruptcy court must have statutory authority and constitutional authority to enter a final judgment on a claim. *See Stern v. Marshall*, 564 U.S. 462, 482 (2011); *see also In re Galaz*, 765 F.3d 426, 431 (5th Cir. 2014) ("A bankruptcy court may enter final judgment only if . . . [it]

9

has both statutory and constitutional authority to do so."). Younge contends the Bankruptcy Court lacked both types of authority to adjudicate his claims. Tribune counters that Younge's claims fall within the Court's statutory authority. It also claims he forfeited any objection to the Court's constitutional authority to decide his claims. We address the parties' arguments in turn.

### 1. Younge consented to the Bankruptcy Court's statutory authority to decide his claims.

"A bankruptcy court's statutory authority [to decide a claim] derives from 28 U.S.C. § 157(b)(1), which designates certain matters as 'core proceedings' . . . ." *In re Galaz*, 765 F.3d at 431. A bankruptcy court has the constitutional authority to enter a final judgment on core proceedings, and, if a claimant appeals, the district court reviews the bankruptcy court's judgment "under traditional appellate standards." *Stern*, 564 U.S. at 475. The statutory scheme gives several examples of core proceedings, *see* 28 U.S.C. § 157(b)(2), but explicitly excludes "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims," *id.* § 157(b)(2)(B). It specifies that these claims "shall be tried in the district court in which the bankruptcy case is pending . . . or in the district court in the district in which the claim arose." *Id.* § 157(b)(5).

Relying on these provisions, Younge asserts the Bankruptcy Court lacked statutory authority to decide his claims because they fall under the exception for personal injury tort claims. Tribune responds that the Bankruptcy Court had "the authority to *disallow* a personal injury tort claim" that "fails as a matter of law." Tribune Br. at 24-25 (emphasis added) (footnote omitted). It further contends the exception in

§ 157(b)(2)(B) is only implicated when it is necessary to determine the dollar amount of a claim.

"The term 'personal injury tort claim' is not expressly defined in Title 28 or Title 11." *In re Arnold*, 407 B.R. 849, 851 (Bankr. M.D.N.C. 2009). Bankruptcy courts have adopted different definitions of the term, *see id.* at 851-53, and only a subset have categorized civil rights claims as "personal injury tort claims," *see id.* at 852.[2] Here, however, we need not decide whether Younge's claims are personal injury tort claims because he consented to the Bankruptcy Court's statutory authority. As the Supreme Court has explained, a party may forfeit or waive any objections to § 157(b)(5) because that provision is not jurisdictional. *See Stern*, 564 U.S. at 479-80. A claimant waives an objection under § 157(b)(5) when he "implicate[s] the jurisdiction of th[e] bankruptcy court[,] . . . [chooses] to be a party to that litigation," and thus "consent[s] to that court's resolution of his . . . claim[s]. . . ." *Id.* at 481 (internal quotation marks omitted).

Consistent with these principles, Younge voluntarily submitted to a decision by the Bankruptcy Court, as he filed a proof of claim, filed a response to Tribune's objection, filed a supplemental response, and appeared at a hearing before that Court. Although his proof of claim and initial response were

---

[2] Bankruptcy courts also disagree on whether they may disallow personal injury tort claims under § 157(b)(2). *See In re Dow Corning Corp.*, 215 B.R. 346, 349-51 (Bankr. E.D. Mich. 1997). We express no view on this issue and, as noted, focus our analysis on consent and waiver. *See Stern*, 564 U.S. at 479-82 (declining to construe the personal-injury-tort-claim exception because the respondent consented to the bankruptcy court's resolution of his claims, thus waiving any statutory objection to the contrary).

*pro se*, neither his counseled filing (*e.g.*, his supplemental response) nor his counsel's statements to the Court included any type of objection to the Court's statutory authority. Instead, his counsel acknowledged the Bankruptcy Court would "evaluate [his] claim[s]" and pointed to evidence that would assist the Court in ruling in his favor. App. at 212a. In this context, we conclude that Younge consented to the Bankruptcy Court's resolution of his claims and waived any argument to the contrary.

Accordingly, the Bankruptcy Court had statutory authority to decide his claims.

> **2.    The Bankruptcy Court had constitutional authority to enter a final judgment on Younge's claims because he knowingly and voluntarily consented to its jurisdiction.**

Younge also challenges the Bankruptcy Court's constitutional authority to decide his claims. He contends the Court was required to obtain his express consent before deciding his claim. *See* Younge Br. at 24 (arguing Younge never affirmatively consented to litigate his claim in bankruptcy court). Because it failed to do so, he claims it lacked constitutional authority to enter a final judgment on the merits.

We disagree. No court has stated that a litigant must expressly consent to a bankruptcy court's jurisdiction. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948 n.13 (2015) ("[T]he Constitution does not require that consent be express. . . ."). While the Supreme Court has held that a litigant must "knowingly and voluntarily consent" to jurisdiction, *id.* at 1939, it has also stated that consent may be "express or implied," *id.* at 1948. The Court explained that a

12

party may impliedly consent through his "actions rather than [his] words," *id.* (internal quotation marks omitted) (quoting *Roell v. Withrow*, 538 U.S. 580, 589-90 (2003)), and that a litigant's consent gives bankruptcy courts the constitutional authority to enter a final judgment on claims that ordinarily require a ruling by an Article III court,[3] *see id.* at 1939.

In the wake of *Wellness*, several courts have opined on what actions (and omissions) amount to implied consent. Most prominently, the Fifth Circuit has held a party impliedly consents to bankruptcy jurisdiction when he "raise[s] no constitutional objection when joining the case." *Matter of Delta Produce, L.P.*, 845 F.3d 609, 617 (5th Cir. 2016). District courts have echoed this conclusion, stating a litigant impliedly consents to jurisdiction by appearing before the bankruptcy court "without [any] objection." *Cole v. Strauss*, No. 2:16-cv-04143-NKL, 2017 WL 26906, at *9 (W.D. Mo. Jan. 3, 2017), *aff'd*, 732 F. App'x 497 (8th Cir. 2018) (per curiam); *see also Mandel v. Jones*, Civil Action No. 4:12-cv-

---

[3] Article III, § 1, of the Constitution states that "[t]he judicial Power of the United States . . . shall be vested in one supreme Court . . . and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art III, § 1. "Congress has . . . established 94 District Courts and 13 Courts of Appeals, composed of judges who enjoy the protections of Article III: life tenure and pay that cannot be diminished." *Wellness*, 135 S. Ct. at 1938. At the same time, however, "Congress has . . . authorized the appointment of bankruptcy and magistrate judges, who do not enjoy the protections of Article III, to assist Article III courts in their work." *Id.* Though the service of bankruptcy and magistrate judges is no doubt of great value to the federal court system, *see id.* at 1939 & n.2, they are not constitutionally authorized to enter a final judgment in every case.

87, 2016 WL 4943366, at \*5 (E.D. Tex. Sept. 16, 2016) ("Parties may impliedly consent to trial of a debtor's state-law counterclaim when a bankruptcy judge hears evidence and testimony related to that claim without the parties' objections."); *True Traditions, LC v. Wu*, 552 B.R. 826, 838 (N.D. Cal. 2015) ("When it came time for summary judgment . . . , Appellant sought final judgment in its favor *without ever mentioning consent*. . . .  The unmistakable implication from Appellant's motion is that it sought an entry of final judgment in its favor. . . .  Courts confronted with this situation have time and again concluded that the movant had impliedly consented to the bankruptcy court's authority to enter final judgment." (emphasis added) (internal citations omitted)).

In reaching their respective holdings, courts have heeded the views of the Supreme Court on implied consent, "increasing judicial efficiency[,] and checking gamesmanship." *Wellness*, 135 S. Ct. at 1948.  They have observed that the Supreme Court has highlighted "the consequences of 'a litigant . . . 'sandbagging' the court— remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor.'" *Stern*, 564 U.S. at 482 (alteration in original) (quoting *Puckett v. United States*, 556 U.S. 129, 134 (2009)); *see also Wu*, 552 B.R. at 839 (stating a party may not belatedly raise an objection to jurisdiction after the bankruptcy court enters a final judgment against his claims).[4]  Thus courts have required claimants to raise the issue of consent before bankruptcy cases conclude, *see Matter of Delta Produce*, 845 F.3d at 617, and

---

[4] While the Supreme Court made this observation in the context of a bankruptcy court's statutory authority to decide a claim, at least one district court has imported it into its analysis of the bankruptcy court's constitutional authority to enter a final judgment on a claim.  *See, e.g.*, *Wu*, 552 B.R. at 839.

14

have looked to litigants' actions to determine if they have knowingly and voluntarily consented to jurisdiction, *see, e.g.*, *Mandel*, 2016 WL 4943366, at \*5; *In re Pioneer Carriers, LLC*, 583 B.R. 891, 898 (Bankr. S.D. Tex. 2018) ("[T]he [claimant] filed two separate and distinct proofs of claim . . . ; the Debtor filed the Objections . . . ; the [claimant] filed responses to the Objections . . . ; this Court held the [h]earing; and at no time did [either party] . . . ever object to this Court's constitutional authority to enter a final order. . . .  If these circumstances do not constitute consent, nothing does." (internal citations omitted)).

In line with this case law, we conclude that Younge impliedly consented to the Bankruptcy Court's jurisdiction.  As noted, he filed a proof of claim, a response to Tribune's objection, and a supplemental response.  In none of these filings did Younge question the Bankruptcy Court's constitutional authority to decide his claims.  Instead, he indicated he assented to the Court's entry of judgment in his favor.  *See, e.g.*, Younge Suppl. Resp. at 2, Case No. 08-13141 (KJC) (Bankr. D. Del. Aug. 21, 2014), ECF No. 13951 ("Mr. Younge respectfully requests that this Court overrule the . . . [o]bjection.").  He also made clear that he sought a final judgment on the merits, as his counsel presented additional evidence for the Court's consideration and expressly stated that the evidence would allow the Court "to fully evaluate [his] claim," including the issue of "liability."  App. at 212a.  More than a year before issuing a final judgment, the Court notified him that briefing was complete and that it was "reviewing th[e] case." *Id.* at 59a (docket entry on September 8, 2014, stating "Judge Carey is reviewing th[e] case").  Yet neither Younge nor his counsel raised any constitutional objection after that notice was filed.  In view of these actions, Younge knowingly and voluntarily submitted to the Bankruptcy Court's deciding his claims.  *Cf. In re Pioneer Carriers*, 583 B.R. at 898.

15

Consequently, the Court had constitutional authority to enter a final judgment on them.[5]

Younge opposes this conclusion by portraying *Wellness* as intervening authority. He claims he could not raise a constitutional objection during bankruptcy proceedings because the Supreme Court decided *Wellness* "after . . . bankruptcy court submissions were made." Younge Br. at 23. Again we disagree. Although the Supreme Court decided *Wellness* after the parties completed briefing, Younge could have raised an objection with the Bankruptcy Court by filing a notice of supplemental authority. *See* Bankr. D. Del. Local R. 7007-1(b) (2015) ("No additional briefs, affidavits or other papers in support of or in opposition to the motion shall be filed without prior approval of the Court, except that a party may call to the Court's attention and briefly discuss pertinent cases decided *after* a party's final brief is filed or *after* oral argument." (emphases added)). He also could have asked the Court to reconsider its order disallowing his claim. *See* Fed. R. Bankr. P. 3008 ("A party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate."). As such, Younge was not precluded from

---

[5] Though our discussion here somewhat mirrors our analysis of the Bankruptcy Court's statutory authority, the touchstone of both inquiries is different. A bankruptcy court has statutory authority to decide a personal injury tort claim if the party fails to raise an objection under 28 U.S.C. § 157(b)(5). It has constitutional authority to enter a final judgment on the same type of claim if a litigant (1) fails to raise a constitutional objection and (2) knowingly and voluntarily assents to the court's adjudication of his claims. To repeat, a claimant's actions may indicate his knowing and voluntary consent to bankruptcy jurisdiction. *See Wellness*, 135 S. Ct. at 1948.

raising a constitutional objection before the Bankruptcy Court, and we are not persuaded that he raised his concerns "at the first opportunity" by waiting until his appeal to the District Court. Younge Br. at 24.

Accordingly, we hold that the Bankruptcy Court had jurisdiction to decide Younge's hostile work environment and wrongful termination claims. As the District Court reached the same conclusion, we affirm this portion of its decision.

### B. The proceedings in Bankruptcy Court did not deprive Younge of his right to due process, right to a jury trial, or right to counsel.

Younge contends the Bankruptcy Court's proceedings abridged his right to procedural due process, his right to a jury trial, and his right to counsel. He brings his right-to-counsel argument under the Commerce Clause, claiming the Bankruptcy Court's local-counsel requirement inures to the disadvantage of out-of-state litigants. *See* Bankr. D. Del. Local R. 9010-1(d) (2015) ("A party not appearing *pro se* shall obtain representation by a member of the Bar of the District Court or have its counsel associate with a member of the Bar of the District Court. . . ."). We address each contention in turn.

To start, "procedural due process requires 'at a minimum . . . that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *United States v. Ausburn*, 502 F.3d 313, 322 (3d Cir. 2007) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). "[D]ue process considerations apply in the exercise of bankruptcy jurisdiction." *In re Smith Corset Shops, Inc.*, 696 F.2d 971, 976 (1st Cir. 1982). During a bankruptcy proceeding, "both debtors and creditors have a constitutional right to be heard on their claims, and the denial of that right . . .

17

is the denial of due process. . . ." *Matter of Boomgarden*, 780 F.2d 657, 661 (7th Cir. 1985) (alteration omitted) (internal quotation marks omitted).

Here Younge had notice of the Bankruptcy Court's proceedings and had ample opportunities to be heard. He filed a proof of claim and a *pro se* response. When he obtained counsel, he had a hearing before the Bankruptcy Court, and it invited him to submit additional evidence and a supplemental response. He gives us no indication that these procedures were constitutionally lacking. Nor does he point to any additional procedures that were required to decide his claims. As such, we cannot say that the Bankruptcy Court failed to afford him adequate due process. *Cf. In re Bartle*, 560 F.3d 724, 730 (7th Cir. 2009) ("We cannot say that [the Debtor's] substantial rights were affected by an erroneous deprivation of an opportunity to be heard . . . when he has not set forth what he would have brought to the court's attention. . . ."); *McNeil v. Drazin*, 499 B.R. 484, 490 (D. Md. 2013) ("During both hearings . . . , [Appellant] presented evidence and legal arguments . . . before the Bankruptcy Court ruled against him. . . . Thus, [Appellant] had an opportunity to be—and was—heard on this issue." (footnote omitted) (internal citations omitted)).

Moving on to the Seventh Amendment claim, Younge argues he was entitled to a jury trial before the Bankruptcy Court disallowed his claims. However, "there is no Seventh Amendment right to a jury trial for determination of objections to claims." *Katchen v. Landy*, 382 U.S. 323, 337 (1966). Although the Bankruptcy Court viewed the claim objection as a motion for summary judgment, that also "does not violate a party's Seventh Amendment jury trial rights so long as the person having the right to the jury trial is an actual participant in the summary judgment proceeding." *In re TMI Litig.*, 193 F.3d 613, 725 (3d Cir. 1999). Here, as already noted, Younge

18

was an active participant in bankruptcy proceedings because he made several submissions to the Bankruptcy Court before it decided his claims. Thus the Court did not violate his right to a jury trial by disallowing his claims.

Finally, Younge's right-to-counsel argument is waived, as it was never raised before the District Court on appeal. *See DIRECTV Inc. v. Seijas*, 508 F.3d 123, 125 n.1 (3d Cir. 2007) ("It is well established that arguments not raised before the District Court are waived on appeal."). In any event, the Bankruptcy Court's local-counsel requirement does not apply to Younge, as the Local Rules allow litigants to "file or prosecute a proof of claim or a response to their claim" without obtaining local counsel. Bankr. D. Del. Local R. 9010-1(e)(iii) (2015). Although the Court "may . . . direct the claimant to consult with Delaware counsel if the claim litigation will involve extensive discovery or trial time," Younge does not tell us that the Court asked him to find local counsel to help with discovery or a potential trial. Accordingly, even if this contention were preserved for our review, we would not hold that Younge has stated a viable claim under the Commerce Clause.

In sum, the Court did not violate Younge's constitutional rights, and its procedures were constitutionally sound. There is no basis to disturb its decision based on the constitutional concerns Younge raises.

**C. We cannot transfer this case to the Eastern District of Pennsylvania or remand it to the Pennsylvania Commission on Human Relations.**

In the alternative, Younge asks us to transfer this case to the Eastern District of Pennsylvania. He also requests that we remand his claims to the Pennsylvania Commission on

Human Relations and abstain in favor of proceedings before it. We cannot transfer or remand this case to another court because the claims have been discharged under § 524 of the Bankruptcy Code. *See* 11 U.S.C. § 524; *see also* 11 U.S.C. § 1141(d)(1)(A) ("[T]he confirmation of a plan— . . . discharges the debtor from any debt [broadly defined as "liability on a claim," 11 U.S.C. § 101(12)] that arose before the date of such confirmation. . . ."). Thus Younge cannot re-litigate his claims in the Eastern District of Pennsylvania or the Pennsylvania Commission on Human Relations.

### D. The District Court and Bankruptcy Court correctly decided Younge's hostile work environment claim, as Younge did not prove *respondeat superior* liability.

Younge asserts the District Court incorrectly decided his hostile work environment claim. Before addressing the merits of its decision, he raises two procedural arguments. First, he contends the District Court erred in reviewing the Bankruptcy Court's factual findings for clear error because the latter had no statutory or constitutional authority to hear his claims. As noted, however, Younge did not raise any statutory or constitutional objections during bankruptcy proceedings. He also knowingly and voluntarily consented to the Bankruptcy Court's jurisdiction. Thus the District Court applied the correct standard of review to the Bankruptcy Court's findings of fact. *See In re Global Indus. Techs., Inc.*, 645 F.3d 201, 209 (3d Cir. 2011) (en banc) (noting a district court reviews a bankruptcy court's factual findings for clear error and legal conclusions *de novo*).

Next, he argues the Bankruptcy Court and District Court misapplied the summary-judgment standard and failed to give his submissions "proper weight." Younge Br. at 35. But the record demonstrates that both Courts considered Younge's

20

evidence at face value and drew all inferences in his favor. They were not required to do anything more, and Younge does not point us to any evidence that they disregarded or downplayed. As such, we discern no error in the Bankruptcy Court's and District Court's application of the summary judgment standard.

Turning to the merits, Younge argues his hostile work environment claim survives summary judgment because he was subjected to severe or pervasive discrimination. He further contends WPHL had *respondeat superior* liability, as it had actual or constructive knowledge of Schultz's racial hostility.

Under Title VII of the Civil Rights Act of 1964 ("Title VII"), it is unlawful for "an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment . . . because of such individual's race, color, religion, sex, or national origin. . . ."[6]

_____

[6] Younge also brings his hostile work environment claim under the Pennsylvania Human Relations Act. In pertinent part, it provides:

> It shall be an unlawful discriminatory practice . . . [f]or any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or

21

42 U.S.C. § 2000e-2(a)(1). The Supreme Court has observed that Title VII "is not limited to 'economic' or 'tangible' discrimination," *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986), and that it also bars "a discriminatorily hostile or abusive [work] environment," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

"[W]hether an environment is 'hostile' or 'abusive' [is] . . . determined only by looking at all the circumstances[,] . . . includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. To prevail on a hostile work environment claim, a plaintiff must show "1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability. . . ." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (alterations

independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 Pa. Cons. Stat. § 955(a). Because its language is "substantially similar" to Title VII, we interpret both statutes identically and do not undertake a separate analysis of Younge's state-law claim. *Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

omitted) (internal quotation marks omitted) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).

Because the District Court's opinion "hinged on" the final element—"the absence of *respondeat superior* liability"—we focus our analysis on that element of Younge's claim. *In re Tribune Media Co.*, 2017 WL 2622743, at *8. To start, employers may be liable for either a supervisor's or a co-worker's discriminatory acts. Employers are strictly liable for a supervisor's actions "[i]f the supervisor's harassment culminates in a tangible employment action." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). The Supreme Court has defined a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassign[ing] with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

However, "[w]hen the hostile work environment is created by . . . non-supervisory coworkers," employers are "not automatically liable" in all instances. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). "Rather, employer liability . . . exists only if [(1)] the employer failed to provide a reasonable avenue for complaint or . . . [(2)] the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id.*

Younge relies on both theories of *respondeat superior* liability for his hostile work environment claim. He contends WPHL is strictly liable for Schultz's actions because it made a tangible employment decision to assign him to train with Schultz. In his view, the station knew of Schultz's racial bias because Schultz asked Leff, "[W]hy are you training a hoop . . . who doesn't know anything?" App. at 159a (internal

23

quotation marks omitted). Younge claims that Schultz made this statement before the altercation and that Leff relayed Schultz's comments on to Hort (as noted, a supervisor) before he trained with Schultz.

As a preliminary matter, this contention is waived, as Younge never presented it to the Bankruptcy Court. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 253 (3d Cir. 2000) (agreeing with the district court that an issue is waived when a party does not raise it in bankruptcy court). However, even if we consider it on the merits, WPHL's assignments during employee training were not a tangible employment action, as they did not effect "a significant change in [Younge's] employment status." *Ellerth*, 524 U.S. at 761. Thus Younge cannot prove that WPHL is strictly liable under the first theory of *respondeat superior* liability. He may only succeed on his claim if he demonstrates that the station was liable for co-worker harassment. *See Huston*, 568 F.3d at 104 (describing the prerequisites for employer liability for a co-worker's discriminatory actions).

Turning to this point, Younge argues WPHL knew or should have known of Schultz's alleged racial bias. He points out that Hort and Elias told him, "[W]e have had problems with S[c]hultz before." App. at 74a (internal quotation marks omitted). He also asserts that Kerr and Leff were aware that Schultz "ha[d] a problem" and could cause "trouble." *In re Tribune Media Co.*, 2016 WL 1122865, at *2 (internal quotation marks omitted). Finally, he tells us Schultz's personnel file includes an incident from 1993 involving racially charged remarks.

While some of these allegations are troubling, they are still not enough to establish that WPHL knew or should have known of Schultz's racial animus. For example, the statements

24

made by Hort, Elias, Kerr, and Leff plainly indicate that Schultz had a "problem," but none of them specify that he exhibited racial animosity toward his colleagues. Although the incident from 1993 gives us pause, it involved disputed accusations of racial bias and occurred 15 years before Younge's altercation with Schultz. There are no similar incidents in Schultz's personnel file that occurred after the 1993 incident. In view of this evidence, we cannot conclude that the station had actual or constructive knowledge of Schultz's alleged racial animus at the time of the altercation.[7]

Younge counters that WPHL must have known of Schultz's racial bias, as the latter told the Pennsylvania Commission on Human Relations that his nickname was "the Nazi." This statement is undoubtedly disturbing. But the law does not tell us to look at Schultz's comments in isolation. Rather, it directs our attention to what WPHL knew or should have known about his conduct while he was employed there. *See Huston*, 568 F.3d at 104. As such, we may not consider his remarks to the Commission to determine what the station knew (or should have known) when he was its employee. Nor can we make this type of inference based on the record, as

---

[7] Recall that an employer may also be liable for a co-worker's discriminatory acts "if . . . [it] failed to provide a reasonable avenue for complaint." *Huston*, 568 F.3d at 104. Younge does not argue that WPHL failed to provide a reasonable way to assert a complaint. In any event, we cannot impute liability to the station on this basis because the record demonstrates that Younge had an opportunity to complain about Schultz's behavior and that the station took those complaints seriously, launching an internal investigation and terminating Schultz after the investigation concluded.

25

Schultz never mentioned whether WPHL's management knew of his nickname during his tenure there.

Finally, Younge points to Schultz's interview with WPHL's Human Resources Department after the incident. He asserts this interview gave the station adequate knowledge that Schultz exhibited racial bias, as Schultz admitted he used the terms "Spike Lee" and "hoop" in reference to Younge. App. at 159a-60a. Even if this were true, WPHL discharged Schultz immediately after the interview, taking "prompt and appropriate remedial action" once it learned of his comments. *Huston*, 568 F.3d at 104 (noting an employer is liable for co-worker harassment if "[it] knew or should have known of the harassment and failed to take prompt and appropriate remedial action"). Thus Schultz's statements during his interview are not enough to sustain Younge's hostile work environment claim.

In sum, nothing in the record allows us to conclude that WPHL had *respondeat superior* liability for Schultz's conduct. Although we agree that certain portions of the record are troubling, they do not touch on WPHL's knowledge of Schultz's racial animus—a key facet of Younge's hostile work environment claim. Accordingly, we affirm the District Court's holding on this claim.

>
> **E.      The District Court correctly decided Younge's wrongful termination claim because WPHL offered a legitimate, non-discriminatory reason for his termination and Younge failed to demonstrate pretext.**

Younge contends the District Court incorrectly decided his wrongful termination claim. He insists WPHL's reasons for discharging him were pretextual and that the station terminated his employment because of his race and/or color.

26

Tribune counters that it provided a legitimate, non-discriminatory reason for ending Younge's employment. It asserts Younge cannot demonstrate pretext in this context, as he received the same treatment as Schultz.

Title VII prohibits employers from "discharg[ing] any individual . . . because of [his] . . . race." 42 U.S.C. § 2000e-2(a)(1). As noted, we analyze wrongful termination claims by using the *McDonnell Douglas* burden-shifting framework, *see McDonnell Douglas*, 411 U.S. at 802-05, which gives a plaintiff "the initial burden . . . of establishing a *prima facie* case of racial discrimination," *id.* at 802. Once he has done so, "the burden . . . shifts to the defendant to offer evidence of a legitimate, non[-]discriminatory reason for the [adverse employment] action." *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 974 n.2 (3d Cir. 1998). After a defendant provides this type of evidence, "the burden . . . rebounds to the plaintiff, who must . . . show . . . that the employer's explanation is pretextual." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

We start with the first step of the framework. To establish a *prima facie* case, Younge must prove "that he (1) was a member of a protected class . . . , (2) was qualified for the position at issue, (3) suffered an adverse employment action[,] and (4) was ultimately replaced" under circumstances that support an inference of unlawful discrimination. *Connors*, 160 F.3d at 973-74. He no doubt meets the first three elements, as he (1) is an African-American man who (2) has years of experience in the industry and (3) was discharged from his position. The parties, however, dispute whether he can establish the final element of a *prima facie* case. The Bankruptcy Court and District Court also took different paths as to the last element. *Compare In re Tribune Media Co.*, 2016 WL 1122865, at *8 (Bankruptcy Court stating Younge cannot satisfy the fourth element of a *prima facie* case), *with In re*

27

*Tribune Media Co.*, 2017 WL 2622743, at \*10 (District Court stating it "assumes, without analyzing, that Younge meets the *prima facie* case").

For our purposes, we adopt the same position as the District Court and assume, without deciding, that Younge has proven a *prima facie* case of racial discrimination. As such, we move on to the second step of the framework and evaluate whether WPHL has provided a legitimate, non-discriminatory reason for his termination. If it cannot satisfy this burden, Younge is entitled to summary judgment in his favor. *See Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). However, if the station meets its burden, we continue our analysis to the final step of the *McDonnell Douglas* framework. *See id.*

Here WPHL supplied a legitimate and non-discriminatory reason for Younge's termination because it stated that he was fired for violating the station's Code of Conduct and Anti-Harassment Policy. WPHL's representatives also told the Pennsylvania Commission on Human Relations that Younge "was discharged because he violated the [s]tation's policies against fighting." App. at 139a. This is enough to satisfy the employer's "relatively light burden" under the *McDonnell Douglas* framework. *Fuentes*, 32 F.3d at 763; *see also Fasold v. Justice*, 409 F.3d 178, 185 (3d Cir. 2005) (noting an employee's repeated failure "to submit proper leave forms" and "unwilling[ness] to work necessary overtime hours" may be legitimate, non-discriminatory reasons for termination). Accordingly, Younge is not entitled to summary judgment on his wrongful termination claim, and we must proceed to the last step of the framework.

To repeat for convenience, the final step of the *McDonnell Douglas* framework requires the plaintiff to prove

28

that the employer's reasons for his termination were pretextual. He may do so by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons . . . or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. If he succeeds in meeting this burden, he has defeated summary judgment on his wrongful termination claim. *See id.* If he falls short, however, the employer is entitled to summary judgment in its favor. *See id.*

In this case, Younge has not carried his burden under the first prong. Far from giving us evidence from which we could "disbelieve the [station's] articulated . . . reasons" for terminating his employment, *id.*, he admitted he cursed at Schultz during the altercation, *see* App. at 161a, engaging in conduct that was barred by WPHL's policies. Thus the record does not give us sufficient basis to discredit WPHL's explanation for its employment decision. *See Fuentes*, 32 F.3d at 765 (observing that a plaintiff may prevail on the first prong if he "present[s] sufficient evidence to . . . throw into question, *i.e.*, to cast substantial doubt upon, [an employer's] . . . reasons"). Instead, it lends credibility to the station's rationale and forces Younge to rely on the second prong to demonstrate pretext and survive summary judgment.

Turning to this part of the analysis, Younge argues that a discriminatory reason was more likely than not a motivating cause for the station's actions because it treated Schultz more favorably after altercations in 1993 and 2002. *See id.* (noting that a plaintiff may prove pretext under the second prong if "the employer treated other . . . similarly situated persons not of his protected class more favorably"). He contends Schultz remained employed at the station after both incidents and received only a written warning for the altercation in 2002 even

29

though it also involved profanity.  Because the incident in 2008 was Younge's first altercation, he claims the station disciplined him more harshly for the same type of conduct.

Although Younge correctly notes that Schultz was disciplined more leniently for his previous altercations, that is not enough to show that WPHL's reasons for Younge's termination were pretextual.  Instead, he must show that Schultz was "similarly[]situated in all respects"—in other words, he "dealt with the same supervisor, . . . [was] subject to the same standards[,] and . . . engaged in the same conduct" during his earlier altercations.  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).  Younge has not done so here, as he has not told us whether the station had the same employment policies in 1993 or 2002 or whether Schultz's earlier altercations involved the same degree of yelling, profanity, and disruption.  *See E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 776 (8th Cir. 2003) ("To be probative evidence of pretext, the misconduct of more leniently disciplined employees must be of 'comparable seriousness.'" (internal quotation marks omitted) (quoting *McDonnell Douglas*, 411 U.S. at 804)).  Hence we cannot conclude that Schultz's previous altercations are comparable to the altercation between Younge and Schultz in 2008.

Younge also contends that the station treated Schultz more favorably after this altercation because the latter received a severance while Younge "was tossed out on[]to the street." Younge Br. at 33.  But again, Younge and Schultz were not similarly situated in this context.  *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) ("To meet her burden of demonstrating that another employee is 'similarly situated,' a plaintiff must show that there is someone who is directly comparable to her in all material respects.").  While Younge was a seasonal, non-union employee, Schultz was a full-time, union employee who had been with WPHL

since 1972. Accordingly, their tenure and status at the station are not comparable, and the station's failure to give Younge a severance does not indicate its reasons for discharging him were pretextual.

It follows that Younge cannot demonstrate that WPHL terminated his employment out of discriminatory hostility. There is no comparator that suggests WPHL's decision was guided by racial bias or some other "illegitimate factor." *Fuentes*, 32 F.3d at 765. Instead, as the Bankruptcy Court aptly observed, "the best comparator for Younge's firing is the [s]tation's treatment of Schultz, who participated in the same incident and was investigated at the same time by the same people. It is undisputed that [Younge and Schultz] received the same treatment," as both were terminated for violating the Code of Conduct and Anti-Harassment Policy. *In re Tribune Media Co.*, 2016 WL 1122865, at *11.

Hence Younge cannot show that WPHL's reason for firing him was pretextual. As the Bankruptcy Court and District Court reached the same conclusion, we concur with their decision on this claim.

## IV. Conclusion

Younge challenges the Bankruptcy Court's statutory and constitutional authority to decide his employment discrimination claims and asks if he can recover for an incident of racial harassment by Schultz, a co-worker at WPHL. We lack any basis to question the Court's authority at this stage, as Younge never objected to it during bankruptcy proceedings and instead knowingly and voluntarily submitted to the Court's jurisdiction.

When we turn to the merits, we also see no reason to disturb the District Court's decision affirming that of the

31

Bankruptcy Court. Although Schultz exhibited racial animosity toward Younge, we cannot impute liability to WPHL for a hostile work environment claim because we have no evidence that it had knowledge of Schultz's racial bias at the time of the incident. Similarly, we cannot say that Younge was wrongfully terminated because WPHL provided a legitimate, non-discriminatory reason for his discharge. More importantly, its rationale was not pretextual because Younge and Schultz were both fired for engaging in the same conduct. Younge gives us no examples of similarly situated individuals who were disciplined more leniently for the same type of conduct. Without this type of evidence, we cannot rule in his favor. Thus we affirm.