NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3247
_____

SHAWANNA WRIGHT, Appellant

v.

PROVIDENCE CARE CENTER, LLC;
BEAVER VALLEY ASSOCIATES, LLC,
d/b/a PROVIDENCE CARE CENTER
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-17-cv-00747)
District Judge:  Hon. J. Nicholas Ranjan
_____

Submitted Under Third Circuit LAR 34.1(a)
June 15, 2020

Before:  JORDAN, MATEY, and ROTH, *Circuit Judges.*

(Filed: August 10, 2020)
_____

OPINION*
_____

_____

    * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Shawanna Wright was fired from her job as a Licensed Practical Nurse ("LPN") after getting into a verbal altercation at the nursing home where she worked. In response, Wright, who is disabled within the meaning of the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA"), and who had returned from medical leave pursuant to the Family Medical Leave Act ("FMLA") less than three months before her firing, sued her now-former employer, Providence Care Center LLC ("Providence").[1] As relevant to this appeal, she alleges that the real reasons Providence let her go were disability discrimination in violation of the ADA and PHRA, and retaliation for exercising her rights under the ADA, PHRA and FMLA. In addition, she says she was subjected to a hostile work environment because of her disabilities, which is also a violation of the ADA.

The District Court granted summary judgment in Providence's favor on each of those claims. Based on our review of the record, we agree with that decision. Wright has failed to raise a genuine dispute of material fact as to whether she was fired for any reason other than the one expressly stated by Providence: her role in a fight at work. And the purportedly adverse employment conditions that Wright says she was forced to endure were not sufficiently severe or pervasive to amount to a hostile working environment. Accordingly, we will affirm.

---

[1] Wright also brought suit against Beaver Valley Associates, LLC. Although it is an appellant, because Beaver Valley's role in this case is irrelevant to the disposition of this appeal, we refer only to Providence throughout this decision.

## I.  BACKGROUND[2]

Wright began working at Providence, a rehabilitation and skilled nursing facility, in 2003.  Between 2003 and 2014, she consistently received positive performance evaluations.  During the time relevant to this lawsuit, she was supervised by Bobbye Lutz, a Registered Nurse.

Wright suffers from allergic asthma, Oral Allergy Syndrome, migraines, depression, and anxiety.  It is undisputed that she is disabled within the meaning of the ADA and the PHRA.  In July 2015, she provided Providence with a physician's note asking Providence to "extend the helpful practice of not serving … raw bananas" in her presence, to avoid triggering her Oral Allergy Syndrome.  (JA 353.)  Although Providence says it offered Wright the opportunity to change to a shift where food would not be served and Wright declined that offer, it acknowledges that it did not have an "interactive dialogue" with Wright about potential accommodations.  (JA 130-31.)

Wright also requested that latex balloons be kept away from her, since she is allergic to them too.  She alleges that, despite her request and Providence's knowledge of that allergy, latex balloons were used to celebrate the "employee of the month," causing her to get sick at work.

According to Wright, Lutz began treating her poorly in 2015, shortly after she began requesting medical accommodations.  The mistreatment consisted of giving her

---

[2] Wright's claims were dismissed on summary judgment, so we view the evidence, and draw all inferences, in the light most favorable to her.  *Advanced Fluid Sys., Inc. v. Huber*, 958 F.3d 168, 173 n.2 (3d Cir. 2020).

unwarranted discipline and an unfairly negative performance review, transferring her from her usual floor assignment to a less desirable unit, causing her to be "pulled" from her usual floor to other units after she had been transferred back to her usual floor, being rude and condescending to her, and ignoring her. (JA 6.)

On August 13, 2015, Wright filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against Providence, alleging discrimination based on race and disability. Providence filed a response, and the EEOC dismissed the charge on June 29, 2016.

To deal with her migraines, anxiety, and depression, Wright took medical leave pursuant to the FMLA from March 17, 2016 through July 11, 2016. She says that, while on leave, Lutz repeatedly called her, asked her to take certain medical tests, and encouraged her to return to work early. Wright attempted to return to work in May 2016, but was unable to continue for more than a single day because of her headaches. That same day, a bushel of bananas was delivered to the nursing station on Wright's floor as part of "Nurses Appreciation Week," but was removed immediately upon Wright's request. (JA 75.)

Wright alleges that, within a week of her returning to work full-time in July 2016, she was working at her computer when Lutz came to her and asked how she was feeling. At some point in the conversation that followed, Lutz told her that she "should collect disability." (JA 54.) Although Wright does not recall if Lutz used the words "quit or resign[,]" she contends that "the clear context of the conversation was suggesting [she] make the choice to stop working for Providence, as [Lutz] felt [she] was too disabled to work." (JA 224.)

4

A key event occurred on September 23, 2016. That day, Wright got into a shouting match with one of her subordinates. The subordinate was not disabled, nor is there any evidence that the subordinate had engaged in protected activity under the ADA, PHRA, or FMLA. Wright did not use profanity, strike, or verbally threaten anyone during the confrontation, but several Providence employees saw or heard the altercation and provided written statements. At least one witness stated that Wright and the subordinate needed to be physically separated to prevent the fight from escalating.

Providence's employee handbook characterizes "[f]ighting, assault, or any other disorderly conduct" as "very serious misconduct." (JA 269.) Company policy provides that employees can be discharged for engaging in very serious misconduct, even if it is their first such offense. Both Wright and her subordinate were fired a few days after the altercation. The stated reason for Wright's termination was engaging in behavior that was "threatening, intimidating, and disruptive[,]" which was "considered disorderly and very serious misconduct[.]" (JA 390.)

Wright, a unionized employee, filed a grievance challenging her termination. During the grievance hearing, which she attended with a union representative, Wright acknowledged getting loud during the confrontation, and no mention was made of discriminatory or retaliatory conduct by Providence or any of its employees. Within a month, however, Wright filed a second charge of discrimination with the EEOC. That charge, which paved the way for this lawsuit, alleged discrimination based on race, national origin, and health, and further alleged retaliation, a failure to accommodate, and a hostile work environment.

5

On June 7, 2017, Wright filed her original complaint in this case, asserting numerous race and disability-based discrimination claims. Through motions to dismiss, amended pleadings, and the voluntary withdrawal of certain claims, Wright was, by the end of discovery, continuing to pursue only the following causes of action: (i) discrimination, retaliation, and hostile work environment in violation of the ADA; (ii) discrimination and retaliation in violation of the PHRA; and (iii) retaliation in violation of the FMLA.

Providence moved for summary judgment on all of those claims. The District Court granted the motion in its entirety, concluding that Wright had not put forth evidence that cast doubt on Providence's stated reason for firing her (*i.e.*, her role in the altercation) or that supported an inference of a causal nexus between her termination, and her participation in an activity protected by the ADA, PHRA, or FMLA. Wright timely appealed.

II. **DISCUSSION**[3]

A. **Disability Discrimination Under the ADA**[4]

Wright essentially asserts two errors by the District Court in dismissing her disability discrimination claims. First, she argues that the Court failed to recognize that

---

[3] The District Court had jurisdiction over Wright's federal law claims and related state law claims pursuant to 28 U.S.C. §§ 1331 and 1367, respectively. We have appellate jurisdiction under 28 U.S.C. § 1291. "It is well established that we employ a plenary standard in reviewing orders entered on motions for summary judgment, applying the same standard as the district court." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[4] Because our analyses under the ADA and the PHRA are identical, we need only discuss Wright's ADA claim. *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir.

Lutz's comment about her collecting disability benefits constitutes "direct evidence" of discrimination, entitling her to proceed under the "mixed-motives" framework established by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).[5]  Second, she contends that, even absent direct evidence of discrimination, the District Court wrongly concluded that she did not satisfy her obligation under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),[6] to raise a genuine dispute of material fact regarding whether the stated reason for her dismissal, namely the altercation, was a pretext for unlawful discrimination.  Having considered the record, however, we discern no error by the District Court in either respect.

---

2010).

[5] "[I]n the *Price Waterhouse* framework ... the evidence the plaintiff produces is so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production. Both the burden of production and the risk of non-persuasion are shifted to the defendant who ... must persuade the factfinder that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir. 1994).

[6] "An employee proceeding under the *McDonnell Douglas* pretext framework bears the initial burden of establishing a prima facie case by showing: (1) that she was a member of a protected class, (2) that she was qualified for the job, and (3) another person, not in the protected class, was treated more favorably.  If the employee establishes a *prima facie* case, the burden shifts to the employer to establish a legitimate nondiscriminatory reason for its employment action.  If the employer provides such a reason, the burden shifts back to the employee to show that the proffered reason was mere pretext for actual discrimination." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 n.5 (3d Cir. 2016) (internal citations omitted).

## 1. Direct Evidence

As to Wright's assertion that she has produced direct evidence of discrimination, we agree with the District Court that the statement Lutz allegedly made about collecting disability payments does not qualify as such evidence. A plaintiff seeking to rely on purportedly direct evidence faces the "high hurdle" of demonstrating that the proof meets two criteria: first, that it is "strong enough to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the [defendant's] decision[;]" and second, that it is "connected to the decision being challenged by the plaintiff." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (internal quotation marks and citation omitted) (first alteration in original).

According to Wright, Lutz "asked … how I was feeling, and then she told me – brought up to me about collecting disability." (JA 54.) Although Wright avers that Lutz "may have even used the words quit or resign," she acknowledges that she does not recall whether Lutz used those terms. (JA 224.) On its face, Lutz's statement – assuming she made it – mentions disability but does not say that she viewed Wright as too disabled to work or that Wright's disabled status put her job at risk. *Cf. Fakete v. Aetna, Inc.*, 308 F.3d 335, 336 (3d Cir. 2002) (holding statement by supervisor was direct evidence of age discrimination where, in response to plaintiff's question about his future at the company, supervisor stated that "the new management … wouldn't be favorable to [the plaintiff] because they are looking for younger single people that will work unlimited hours and that [the plaintiff] wouldn't be happy there in the future."). The statement, which can as easily be understood as an expression of concern for an employee who recently returned from a

8

significant medical leave, does not clear the "high hurdle" of proof to constitute direct evidence of discrimination. *Anderson*, 621 F.3d at 269; *see also Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 513 (3d Cir. 2004) (supervisor's questioning the plaintiff about her retirement plans was not direct evidence of age discrimination because questioning "could just as easily be explained by a desire on [the employer]'s part to do some long-term planning."); *cf. Fakete*, 308 F.3d at 340 n.5 (recognizing that "ambiguous" comments may be insufficient to constitute direct evidence).

### 2.    Pretext under *McDonnell Douglas*

Wright's contention that her discrimination claims pass muster under *McDonnell Douglas* is also without merit.  Assuming Wright has made a prima facie showing of unlawful disability discrimination, Providence has nevertheless carried its burden of production by articulating a legitimate, non-discriminatory reason for her firing: the altercation.  Our focus, therefore, is on the final prong of the *McDonnell Douglas* analysis. Specifically, we ask if Wright has come forward with sufficient evidence to raise a genuine dispute of material fact as to whether Providence terminated her employment based on the altercation or whether that was merely a pretext for discrimination.  The answer is she has not.

To show pretext, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  "[H]owever, the plaintiff cannot simply show that the

9

employer's decision was wrong or mistaken …. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence[.]" *Id.* at 765 (internal quotation marks, citations, and emphasis omitted).

Wright cannot overcome what the record clearly shows. She and her subordinate got into a loud argument at the nursing home. Although Wright downplays the severity of it, she does not – and, indeed, cannot – refute that it occurred and that it was heated and loud. Numerous Providence employees provided written eyewitness statements detailing the confrontation. By some of those accounts, another employee had to step between and separate Wright and the other employee to prevent the situation from escalating further. Those statements were neither solicited by Lutz nor made at her request, and there is no evidence that anyone with a discriminatory animus influenced the contents of any of the statements.

The record is also clear that such an altercation constitutes disorderly conduct within the meaning of Providence's standards. Wright herself acknowledged as much in her deposition. Under Providence's employment policies, employees engaging in disorderly conduct are subject to immediate discharge. Given those facts, Wright lacks a practicable path to discrediting Providence's stated reason for terminating her employment. *See In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (holding that "the record does not give us sufficient basis to discredit [the employer]'s explanation for its employment decision" where the plaintiff "admitted he cursed at [another employee] during the

10

altercation … engaging in conduct that was barred by [the employer]'s policies.") (internal citation omitted).

Wright similarly has not produced evidence from which a factfinder could reasonably believe that invidious discrimination was more likely than not a motivating or determinative cause of Providence's decision to fire her. *Fuentes*, 32 F.3d at 764. In an effort to suggest pretext, Wright makes three arguments: other Providence employees were treated less harshly for engaging in the same or equally serious conduct; her positive work history prior to coming under Lutz's supervision makes it unreasonable to believe she was fired based on a single event; and Lutz's purported mistreatment of her demonstrates a discriminatory animus that impacted the decision to fire her. But those arguments, considered separately or collectively, do not show any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Providence's decision to fire her for getting into a shouting match in what should be the quiet of a rehabilitation facility. *Id*. at 765.

### a) Comparator evidence

A plaintiff can demonstrate pretext by presenting evidence that similarly situated persons not within the plaintiff's protected class were treated more favorably by the defendant employer. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). To be similarly situated, comparator employees must be similarly situated in "all respects." *In re Tribune Media Co.*, 902 F.3d at 403. A determination of whether employees are similarly situated takes into account factors such as an employee's job

responsibilities, the supervisors and decision-makers, and the nature of the misconduct at issue. *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259–261 (5th Cir. 2009).

Wright's comparator evidence consists of two categories of Providence employees she argues were treated more favorably than she was: those that engaged in the same type of conduct (*i.e.,* yelling or fighting) and those that engaged in conduct different than that at issue but supposedly equally serious. Regarding the "same conduct" evidence, several of the comparators Wright points to were lower level nursing assistants, not nurses like Wright, and, therefore, not similarly situated. To the extent Wright was able to identify nurses rather than nursing assistants, she failed to provide any specifics about what transpired, when it transpired, or even whether Providence had the same disciplinary policy in place at the time.[7] Accordingly, and like the nursing assistants, those individuals are not valid comparators. *See In re Tribune Media Co.*, 902 F.3d at 403 (holding purported comparator evidence insufficient to demonstrate pretext where plaintiff "has not told us whether the station had the same employment policies in 1993 or 2002 or whether [the comparator]'s earlier altercations involved the same degree of yelling, profanity, and disruption.").[8]

---

[7] According to the Providence employee handbook, the disciplinary policy at issue here, Policy 1-14, was reviewed and revised on September 13, 2012. None of the parties cite any evidence identifying the changes that were made.

[8] These nurses also appear to be insufficient comparators for the independent reasons that (i) Wright cites no evidence that establishes whether or not they were disabled, and (ii) it is unclear whether Lutz was their supervisor when the incidents occurred.

12

Wright's other supposed comparator evidence – Providence employees who were not fired despite engaging in conduct that was "comparably serious" to Wright's altercation – is also unpersuasive. The only allegedly comparable individual actually identified is Joyce Novolio,[9] and she did not engage in "comparably serious" conduct to the altercation that led to Wright's discharge.[10] "Comparable seriousness may be shown by pointing to a violation of the same company rule, or to conduct of similar nature." *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007) (internal citations omitted). Novolio's workplace infractions, almost all of which were a species of poor job performance, were serious but qualitatively different from the disorderly conduct that got Wright fired.[11] Moreover, unlike Wright's disorderly conduct, and contrary to her

---

[9] Like Wright's "same conduct" evidence, many of the purportedly comparable individuals are unnamed and the timing of their actions are unstated. There is no evidence regarding whether any of these people are disabled. Moreover, it is unclear whether Lutz or a different Providence employee supervised those unnamed employees.

[10] Novolio is Lutz's sister. Although we need not decide the issue, that fact alone likely precludes Novolio and Wright from being similarly situated. *See Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) ("In the usual case a plaintiff must at least show that the comparators …engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (internal quotation marks omitted); *cf. Harville v. City of Houston*, 945 F.3d 870, 878 (5th Cir. 2019) ("We agree with the district court that [the plaintiff] fails to demonstrate how a decision based on family preferences intentionally discriminated on the basis of race."); *Neal v. Roche*, 349 F.3d 1246, 1251 (10th Cir. 2003) ("'[F]riendship' and 'nepotism' cases. … hold that an employer's actions based on loyalty to a friend or relative (particularly an unemployed friend or relative) are not considered 'discriminatory,' even where they benefit the nonprotected friend or relative at the expense of a more qualified, protected person.").

[11] Novolio's faults included poor attention to accuracy in administering medications, not promptly responding to patient calls, and incorrectly documenting

13

assertions otherwise, none of Novolio's actions constituted "very serious misconduct" under Providence's discipline policy.[12] Consequently, Wright's comparator-based pretext argument fails.

### b) Other evidence

Turning to Wright's non-comparator arguments of pretext, we are unpersuaded that she has carried her burden under *McDonnell Douglas*'s third prong. Again, that asks if she has raised a genuine issue of material fact calling into question whether Providence's stated reason for firing her was a pretext for discrimination. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 371 (3d Cir. 2008), *order clarified*, 543 F.3d 178 (3d Cir. 2008) (reversing grant of defendant's motion for summary judgment where testimony created "genuine issues of material fact" of whether the defendant's "asserted reasons for discharging her [were] pretext"). Wright's generally positive work history prior to her discharge, while admirable, is not pertinent to her discharge for disorderly conduct, which was entirely unrelated to her job performance or competence as a nurse. Indeed, Wright has produced no evidence that there is any relationship between either the duration or quality of an

---

medications and supplies that were used or distributed.

[12] Although Novolio received one "Employee Warning Notice" that stated her conduct was "very serious misconduct" it is apparent from the nature of the offense ("violation of established practices") and the description of potential punishment ("a first offense of any type may result in three days suspension without pay") that such characterization was erroneous, and that the offense only constituted "serious misconduct" under Providence's policy. (JA 415); *see also* (JA 268 (section of Providence handbook stating "[v]iolation of established safety rules and practices" is an example of "serious misconduct," the punishment for which may be "[s]uspension of three-(3) days without pay" for a first offense)).

employee's tenure and the consequences the employee would be subject to for disorderly conduct.

Her evidence of the purportedly discriminatory manner with which Lutz treated her prior to the altercation also would not permit a reasonable fact finder to believe that disability discrimination was more likely than not a motivating or determinative cause of Providence's decision to fire her. *Fuentes*, 32 F.3d at 764. Both Wright and the only other participant in the altercation, her non-disabled subordinate, were promptly terminated as a result of their fight. According to Wright, despite it being "well known" that her subordinate would "act up, be discourteous to fellow staff, and … be loud with management or residents at times[,]" her subordinate nevertheless was "tolerated because it was hard to find and train staff, like many other employees in the facility." (JA 224.) Wright would thus have a fact-finder believe that Providence wanted to be rid of her so badly that it was also willing to fire a hard-to-replace employee who it previously had gone out of its way to keep. The record simply does not bear that interpretation. Because Wright has not presented evidence sufficient to raise a genuine dispute as to whether Providence's stated reason for firing her was a pretext for unlawful discrimination, we will affirm the District Court's dismissal of her disability discrimination claims.

## B. ADA and FMLA Retaliation

Next, Wright contends that the District Court incorrectly determined that there was insufficient evidence to support her retaliation claims. Once more, we disagree.

She conceded before the District Court that her retaliation claims are based on a pretext theory, [13] and thus are subject to the *McDonnell Douglas* burden-shifting framework. All of her claims require the same three elements to make a prima facie showing of retaliation: (i) participation in a statutorily protected activity; (ii) an adverse employment action; and (iii) a causal relation between the protected activity and the adverse employment action. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012) (FMLA retaliation); *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002) (ADA and PHRA retaliation).

The first two elements are easily met. Wright clearly engaged in protected activities by filing the first EEOC charge, by requesting accommodations for her disabilities, and by taking FMLA leave. It is also evident that she endured an adverse employment action when she was fired. But Wright has not sufficiently demonstrated a causal connection between her firing and her participation in any protected activity.

"In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007). "Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee[.]" *Id.*

---

[13] Accordingly, to the extent Wright now argues that she produced direct evidence of retaliation, that argument has been forfeited.

16

Wright's closest-in-time protected activity to her termination was her FMLA leave, which she returned from two to three months prior. That is not long, but neither is it "unusually suggestive" of retaliation. *See Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004), *superseded by statute on other grounds as stated in Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 187-89 & n.30 (3d Cir. 2019) (holding elapse of over two months between protected activity and adverse employment action "is not so close as to be unduly suggestive" of retaliation) (citation omitted); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (three week gap between protected activity and adverse employment action not unduly suggestive of retaliation).

Importantly, Wright's involvement in the altercation constituted a discrete, readily determinable intervening event of sufficient severity to break any causal nexus between her participation in a protected activity and the adverse employment action of which she complains. As discussed, Wright indulged in a loud, heated verbal fight at the nursing home. That is not disputed and, on this record, actually beyond dispute. Providence received eyewitness statements about it from several neutral individuals. Providence's employee handbook states that such behavior is grounds for immediate discharge. Both employees involved in the fracas were in fact promptly discharged. And there is no evidence that Wright's subordinate had participated in any protected activities, so Wright's protected activities appear irrelevant. Engaging in protected activities does not give an employee free reign to disregard workplace rules. Wright cannot avoid the consequences of her very serious misconduct by pointing to protected activities that bear no discernable

17

relationship to her impermissible behavior. *See Naber v. Dover Healthcare Assocs., Inc.,* 765 F. Supp. 2d 622, 639 (D. Del. 2011) (no causal connection between FMLA leave and termination where employee falsified record and employer's handbook specified sanction for a first falsification offense was immediate termination), *aff'd*, 473 F. App'x 157 (3d Cir. 2012). The District Court properly granted summary judgment in Providence's favor on the retaliation claims.

### C.     ADA Hostile Workplace

Wright's last argument, that her ADA hostile workplace claim was improperly dismissed on summary judgment, is also without merit.

A hostile workplace claim under the ADA requires a showing that: (1) the plaintiff is a qualified individual with a disability under the ADA; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) the employer knew or should have known of the harassment and failed to take prompt effective remedial action. *Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999). Determining whether an environment is abusive requires "looking at all the circumstances[,]" including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in

18

the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Instead, a hostile work environment requires conduct that is "severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive[.]" *Harris*, 510 U.S. at 21.

In support of her hostile workplace claim, Wright lists sixteen actions or events she says show persistent and significant mistreatment. Notwithstanding the number of incidents she relies on, we agree with the District Court that Wright has failed to produce evidence sufficient for this claim to survive summary judgment. First, several of the occurrences Wright identifies cannot fairly be characterized as "unwelcome harassment." For example, she cites no evidence that prior to this litigation she was concerned about or even aware of emails among other Providence employees that discussed her [14] or Providence's failure to give her a 2016 annual review. Nor does she cite any case that would support the conclusion that such indirect actions could be deemed harassment.

Second, and more significantly, the connection between much of the alleged harassment and her disabilities is unclear, and the record indicates that Wright herself believes that many of the incidents were attributable to racial bias, which was not at issue on summary judgment and is not at issue on appeal.[15] Setting that aside, the incidents she

---

[14] Moreover, the emails themselves do not support the inference that anyone at Providence harbored unlawful animus towards Wright. Her arguments to the contrary require an unreasonable interpretation of the record.

[15] For example, when Wright was asked whether notes about a meeting reflected any concern on her part that her assignment to a different floor in the facility was because

cites at most suggest a poor relationship between her and Lutz.  Given the absence of a

nexus between that poor relationship and Wright's disability,[16] examples of how that poor

relationship manifested itself cannot support an ADA hostile workplace claim.  *See Walton*,

168 F.3d at 667 (holding that evidence demonstrating a poor relationship between an

employer and an employee is not, by itself, sufficient to sustain a hostile work environment

claim); *see also Uhl v. Zalk Josephs Fabricators, Inc.*, 121 F.3d 1133, 1137 (7th Cir. 1997)

("A personality conflict doesn't ripen into an ADA claim simply because one of the parties

has a disability.").

Finally, and also dispositive of her claim, Wright's evidence of a hostile work

environment, is not, objectively speaking, either sufficiently pervasive or severe to have

altered the conditions of her employment and to have created an abusive working

environment.  As to pervasiveness, the record does not support Wright's assertion that she

was subjected to harassment on "a daily and weekly basis[.]"  (Wright Opening Br. at 44.)

---

of her race, Wright testified that the notes "may not say anything … about my race[,]" but that she "totally disagree[d]" that the issue was unrelated to her race because Lutz "didn't talk to [her]" unless it was about something "negative[,]" Lutz "went to everyone else" if Lutz had a problem with her, she was "told to shut [her] mouth and do [her] work[,]" and she was again pulled to another floor.  (JA 64.)

[16] While Wright claims that Lutz began mistreating her in 2015, after Wright made accommodation requests, Wright also testified that Providence management, including Lutz, was aware of her disabilities dating back to 2003.  (*See* JA 95 ("I asked them to stop bringing the latex balloons into the building.  They knew that. … I've been there since 2003.  They knew I had those problems.").)

As the District Court aptly observed, Wright cites a "handful of incidents that appear to have been spread out over the course of many months." (JA 18.) [17]

We similarly see no error in the Court's conclusion that nothing Wright experienced, taken individually or in the aggregate, could be objectively considered severe enough to alter the conditions of her employment and to create an abusive working environment. Wright directs us to no evidence that anything done or said to her unreasonably interfered with her work performance. To the contrary, she argues that all times she performed her job at or above the level expected of her. And none of the largely isolated incidents that she relies on were "extremely serious." Occurrences such as being ignored, told once to "shut up," hearing an offhand comment about collecting disability, being temporarily pulled to work on another floor at the facility, receiving a marginally negative performance review without cause, and scheduling annoyances, while no doubt unpleasant, are not objectively "extreme," as is required for a viable ADA hostile workplace claim. [18] *Cf.*

---

[17] Indeed, Wright appears to overstate the frequency with which certain alleged harassment occurred. Although she claims that she was "told to shut up or other derogatory comments" (Wright Opening Br. at 44) with some regularity and that after she was reinstated to her unit she "was consistently removed from her unit and placed in other units without stability[,]" (Wright Opening Br. at 45), the evidence Wright cites is only a single instance in which she was removed from her unit post-reinstatement, and that it was during that one, discrete event that Lutz purportedly told Wright to "shut up."

[18] Wright also claims she was harassed because she was "not medically accommodated causing her to throw up and be ill in the workplace." (Wright Opening Br. at 44.) With the possible exception of the delivery of the "Nurses Appreciation Week" bananas, which lone incident was resolved immediately and without harm to her, Wright cites no evidence supporting a reasonable inference that when individuals would bring fruit or balloons into the facility – actions that could trigger her allergies – such conduct was in any way directed towards her or that the conduct only began once Wright's allergies became known. While we neither doubt nor wish to minimize the severity of Wright's

*Faragher*, 524 U.S. at 788 ("These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' … We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment[.]") (internal citations omitted). Because Wright has not produced evidence raising a genuine dispute as to whether she experienced harassment that, viewed objectively, was so pervasive or severe as to change the conditions of her employment and create an abusive work environment, the District Court was correct to grant Providence summary judgment on the ADA hostile workplace claim.

## III. CONCLUSION

For the foregoing reasons, we will affirm the District Court's order granting summary judgement to Providence.

---

allergies or the bouts of sickness she says she endured, we are skeptical that the mere presence of fruit or latex balloons in a nursing home, standing alone, could reasonably be considered harassing, even for someone with Wright's conditions. In any event, it appears that Wright was able to use her "own judgment in leaving the room when someone was eating a banana or other fruit or to leave the immediate area when latex balloons were brought to celebrate." (JA 223.) And although she had to "call out of work 1-2 times per month at the most" for "disability related flare ups," she "viewed [those absences] as an accommodation." (JA 223.) Those facts belie the notion that Wright's exposure to allergens at work was so severe as to change the conditions of her employment and create an objectively abusive work environment.

22